Davis, J.,
delivered the opinion of the court:
The claimant, who is a major in the Ordnance Department, entered the Army after the usual service as a cadet at West Point. In the computation of his longevity pay his period of service is calculated by the accounting officer from the date of his commission as second lieutenant. The seventh section of the act of June 18,1878, provides:
“Sec. 7. That on and after the passage of this act, all officers of the Army of the United States who have served as officers in the volunteer forces during the war of the rebellion, or as enlisted men in the armies of the United States, regular or volunteer, shall be, and are hereby, credited with the full time they may have served as such officers and as such enlisted men in computing their service for longevity pay and retirement.” (20 Stat. L., 150.)
The claimant maintains that while at West Point he was “ an enlisted man in the armies of the United States,” and that this provision entitles him to be credited with the full time spent at the Academy prior to the date of his commission. This suit is brought to recover the difference in longevity pay which that change in the mode of calculation would make.
*210 The act of June 18, 1878, contains the annual appropriations for the Army. The section above cited is part of a general legislation about the Army attached to that appropriation act. Among the results effected by this general legislation was a change in the mode of filling- vacancies in the lowest grade of commissioned officers in the Army.
Prior to that date the President could make these appointments indiscriminately from the graduates of the Academy, or from non-commissioned officers of the Army, or from civil life.
The graduate had a right to be considered as a candidate for any corps for whose duties he might be deemed competent (Eev. Stat., § 1213), but he had no right to an appointment in preference to men selected from other classes. The third section of the act of 1878 peremptorily provides “ that hereafter all vacancies in the grade of second lieutenant shall be filled by appointment from the graduates of the Military Academy, so long as any such remain in the service unassigned.”
Prior to the act of 1878 non-commissioned officers could, under regulations established by the Secretary of War, bo examined by a board of four officers as to their qualifications for the duties of commissioned officers in the line of the Army, and were eligible for appointment as second lieutenants in any corps in the line for which they might be found qualified, but had no absolute right to it. (Eev. Stat., § 1214.) The fourth section of the act of 1878 makes it the duty of every company and battery commander to report to his regimental commander the names of the non-commissioned officers in his command whom he deems worthy of advancement, with his reasons for the opinion. It requires regimental commanders to forward the reports to the departmental commander, with such recommendations of non-commissioned regimental staff as they may deem worthy of promotion. It directs the departmental commander annually to convoke a board to pass upon these recommendations, and it requires the reports of these boards, with full statements as to each person, to be forwarded to the Secretary of War. Similar provisions are made as to st aff corps. Then section 3 directs the President, after exhausting the list of unassigned graduates, to fill the remaining vacancies by promotion from the list of non-commissioned officers made up from these recommendations.
As to appointments from civil life, the act of 1878 worked this change: that prior to that act such appointments could be *211 made to tbe grade of second lieutenant, at tbe option of tbe appointing power; but that after it they could only be made after exhausting tbe classes of graduates and of meritorious non-commissioned officers.
Tbe longevity provisions in section 7 of tbe act, so far as they related to enlisted men, were evidently framed with reference to tbe provisions in sections 3 and 1 changing tbe rule for entry into tbe Army. Under tbe new system, promotions from tbe ranks, which were before to be made at tbe discretion of tbe Secretary of War, would become inevitable when tbe supply of graduated cadets should fail. In order to meet this and to do justice to faithful and meritorious soldiers, Congress provided that tbe period of their services in tbe ranks should be taken into consideration in calculating their longevity pay. For this purpose it was not necessary to change the pay of officers coming into tbe Army through West Point. If any change has been made in their status, it has been done by the use of comprehensive language, which compels us to go beyond the evident purpose of the legislature. That ho such language has been used we now proceed to show.
The claimant’s case rests upon a construction of section 7 of the act of 1878, by which it is made to include cadets in the category of “enlisted men.” Now, it is demonstrable that the phrase “ enlisted men” is used in section 1 of that act in a sense which excludes cadets.
The language in section 1 is: “No money appropriated by this act shall be paid for recruiting the Army beyond the number of 25,000 enlisted men, including Indian scouts and hospital stewards.”
At the close of the war an act was passed “to increase and fix the military establishment of the United States. ” (14 Stat. L., 332.) The number of companies in each line regiment of artillery, cavalry, and infantry, and in the Corps of Engineers, and the number of privates in each company were regulated by this act; and it was further provided that 1,000 men might be enlisted as Indian scouts (§ 6), and that the Secretary of War might enlist as many hospital stewards as he might think necessary.
In 1870 this force was reduced. By the second section of the Army appropriation act of that year it was enacted:
“That the President be, and he is hereby, authorized and directed, on or before the first day of July, eighteen hundred *212 and seventy-one, to reduce the number of enlisted men in the Army to thirty thousand, and thereafter there shall be no more than thirty thousand men enlisted in the Army at any one time, unless otherwise authorized by law.” (16 Stat. L., 317.)
In consequence of the passage of this act, General Order No. 23 was issued in the year 1871, containing the following language:
“Under the foregoing act the following will be the organization of the Army from and after July 1, 1871: ‘Enlisted men of engineers, 301; enlisted men of ordnance, 475; ordnance sergeants at posts, 200; Military Academy band, 24; 60 enlisted men per company for 55 companies of artillery, 3,300; 84 enlisted men per battery for 5 batteries of light artillery, 420; 84 enlisted men per company of 120 companies of cavalry, 10,080; 60 enlisted men per company, for 250 companies of infantry, 15,000; non-commissioned staff of regiments, 200; total, 30,000. The rate of enlisted men per company is to include non-commissioned officers and all other grades.’” Scott’s Digest, § 504, n. 12.)
Departmental estimates were made on the basis of this order, and were sent to Congress; and appropriations were made on the basis of the estimates until the session of 1873-’74, except that a special provision in regard to Indian scouts was made in 1871. During this whole period the usual separate annual appropriation was made for the cadets and the Academy.
By the appropriation act of June 16,1874, it was provided that “no money appropriated by this act shall be paid for recruiting the Army beyond the number of 25,000 enlisted men, including Indian scouts.” (18 Stat. L., 72.) The appropriation •act of the next year repeated this provision, except that hospital stewards were added to Indian scouts as included within the 25,000 enlisted men. (18 Stat. L., 452.) This form has been ■since retained (19 Stat. L., 97; 20 Stat. L., 146), and is identical with what we find in the act of June 18, 1878. The.appropriations for the support of the Academy continue to be separate. (18 Stat. L., 59, 466; 19 Stat. L., 124, 380.)
The conclusion is irresistible that the term “ enlisted men, ” in section 1 of the act of June 18,1878, refers only to the classes embraced in General Order No. 23 and to Indian scouts and hospital stewards, and does not include cadets. This raises a controlling presumption that the same phrase is used in the same sense in section 7; for the rule is well settled that if the same *213 words occur in different parts of a statute they must be taken to have been everywhere used in the same sense when applied to the same subject-matter. (Dwarris on Statutes, 574.)
Such is the present legislative construction of this act, as shown by two statutes passed since this case was argued. The first is the annual appropriation for the Army, approved February 24, 1881, by which it is enacted that “the actual time of service in the Army or Navy, or both, shall be allowed all officers in computing their pay.” If the claimant’s construction of the act of 1878 is correct, this legislation is unnecessary, since cadets are part of the Army (Rev.. Stat., § 1094), and as such in the military service. The second is the act for the relief of T. Scott Payne, approved March 2,1881. Captain Payne entered the Academy in 1862, was appointed a second lieutenant in 1866, resigned in 1868, and re-entered the Army as a second lieutenantinl873. (Army Register.) Congress now enacts that the paymaster, in computing his longevity pay, shall compute the same from the date of his original commission as second lieutenant, and appropriates the difference between what he would have received under this mode of computation and the amounts he has actually received. The clear intent of this act is to put Captain Payne on the footing which he would have been on had he never resigned, and gave him longevity pay according to the statutes as Congress understood them to be in force as to his classmates who remained in the service.
"We should rest our decision here if the able and ingenious briefs of counsel did not raise and discuss other points upon which we entertain opinions equally fatal to the claimant.
“ Enlistment” is a technical word, derived from G-reat Britain, with a technical meaning. In the English Cyclopedia it is defined to be “ a voluntary engagement to serve as a private soldier for a certain number of years.” Chambers defines it as “the mode by which the English army is supplied with troops as distinguished from the Conscription prevailing in many other countries.” Littré, the best French authority, defines Conscription as an “ appel au servicemilitaire, par voie du tirage au sort,” and he defines an enrolé, which is the equivalent of an “enlisted man,” as an “enrolé volontaire.” True to this distinction between a voluntary engagement as distinguished from a conscription or draft the statutes of the United States allow only persons who are able to contract to enter the Army by enlistment *214 (Rev. Stat., §§ 1110, 1117, 1118), and require the contract to be made for a term of years. (Section 1119.) True also to the other idea that this form of engagement is confined to persons who are ordinarily lmown as common soldiers, the statutes employ the term “enlist” only with reference to contracts with persons who enter the Army as privates, and to certain other classes of men, like Indian scouts and hospital stewards, who rank like soldiers, and voluntarily put themselves under military law. (Bev. Stat., §§ 1099,1100,1101, 1102,1103,1104, 1107,1108,1111, 1112, 1115, 1155, 1162,1180.) They not only do not make use of this word or term in providing for the engagement of cadets, but they impose upon the person technically known as an “ enlisted man” many duties which it is evident are not to be imposed upon cadets. Without multiplying examples, it is enough to say that the Secretary of War may appoint as many enlisted men as he ideases to be hospital stewards (Bev. Stat., § 1180), and that he may detail enlisted men for regimental schools. (Ib., § 1231.) It is not for a moment to be supposed that a Secretary of War would appoint or detail cadets for such purposes; but it is equally improbable that Congress would empower him to do so. And yet Congress has done that improbable act, if the term “ enlisted men” necessarily includes cadets.
The idea of an army implies a mass which is led, and leaders or officers who direct it. The leaders, from their natural endowments or from their superior education in military science and training in military art, are presumed to be capable of giving direction and vitality to the mass.
This distinction, which grows out of natural laws, and is common to all history, is recognized in the statutes of the United States. We have already seen what provisions they make for keeping up the rank and file of the Army. It is only necessary to add to what has already been said on that point that some of the more meritorious of common soldiers become what are commonly called, and what are known in the statutes as non-commissioned officers. (Rev. Stat., §§ 1110,1196, 1214, 1286, 1288, 1341, 1342.) But these non-commissioned officers are not officers in the sense in which that word is generally used in the statutes and in the Articles of War and in common parlance. The statutes recognize them as common soldiers and as enlisted men. (Rev. Stat., §§ 1280, 1293.)
*215 The position and rank of Army officers depend, as does the status of the common soldier, upon positive provisions' of law. The Revised Statutes sometimes style them commissioned officers (§§ 1145, 1160); sometimes draw a distinction between commissioned and non-commissioned officers (§§ 1196, 1214, 1286, 1288, 1342); sometimes enumerate the different classes of officers (§-1261) j' sometimes indicate the particular branch of the service to which they belong,- (§§ 1135,1138, 1143,1150, 1167, 1169,1174, 1JL83, 1184,1191, 1192, 1206,1208); and sometimes make general provisions respecting "officers” (§§ 1205, 1209, 1211, 1212, 1217, 1219-1230). But in each and every case such statutes relate only to what are known as commissioned officers; that is, officers who hold, as evidence of their right to office, a commission, signed by the President and sealed with the seal and attested by the Secretary of the Department of War. Commissions of this kind were issued by the Secretary of War under the old Confederation. The Constitution continued the power, vesting it in the President; and the act of August 7, 1789 (1 Stat. L., 49; Rev. Stat., § 216), made the Department of War the channel for its exercise.
Now the cadet receives quite a different evidence of his title to office, viz, a certificate under the hand and seal of the Secretary of War that the President has been pleased to appoint him a cadet. We are informed that the same form of certificate, with trifling variations, has been in use for as long a time as records exist regarding them, and that there is no tradition of any other form. This long and settled usage or custom has the force of law. It is recognized by Congress when it legislates respecting commissioned officers, and it affects the status of a cadet in so far that he certainly is not a commissioned officer.
On the other hand, it may be said with equal certainty that he is not an ordinary private soldier. The private soldier enlists himself (ante) j but the cadet is to be appointed by the President (Rev. Stat., § 1315), and can make no engagement , with the government without that preliminary appointment. The qualifying age of the cadet differs from that of the enlisted soldier and indicates a different object. The term of enlistment of the private is five years, with a right to re-enlist; the cadet agrees to serve for eight years (of which only four will be sp ent as a cadet if his deportment and standing war *216 rant advancement), and if once put out of the Army cannot reenter as a cadet of bis own volition. The enlisted man is to serve as a private soldier in the ranks, or as a non-commisioned officer if selected for that purpose, or as a hospital steward or Indian scout if enlisted therefor; the corps of cadets constitute a battalion, and its members are to be taught and trained not only in all the duties of private soldiers and of non-commissioned officers, whom they' may be expected to care for and look after and lead during their whole lives, but also in all the duties of commissioned officers of every grade which they may afterward occupy.
Being thus required to serve for a term, during one-half of which he is to be trained in the duties of an officer, and during the remainder of which he may serve as a commissioned officer,, and being appointed to his post by the President, a cadet is, in our opinion, an officer — one of that class of inferior officers alluded to in Collins v. The United States (14 C. Cls. R., 568), in which the subject of appointment to such offices was fully discussed. He is never a part of the rank and file of the Army which is to be led; on the contrary, his destiny from the outset is to be among the officers or leaders, for which alone he is educated and trained. The radical test of his relation to the government is this — that he is appointed by the President. The second section of the second article of the Constitution empowers Congress to vest the appointment of inferior officers by law in the President alone. Congress has exercised its power-in this respect in the very language of the Constitution. It has enacted that the corps of cadets “ shall be appointed by the President.” (Bev. Stat., § 1815.) In our opinion, this as clearly makes each member of that corps an inferior officer as if the statute proceeded to declare him so.
But, though an inferior officer,- his status is in no respect that of a non-commissioned officer. The non-commissioned officer is selected and appointed from the ranks by the regimental commander (Begulation 73), and may be arbitrarily reduced there by the power which appointed him. (Ib., 79.) But the cadet, although for-purposes of instruction he may temporarily serve as a private soldier or as a non-commissioned officer within the limits of the Academy, bears those relations only as a pupil, and only towards his fellow-cadets and the officers of the Academy. Towards the government and the Army at large his re *217 lation is that of an uncommissioned officer, with a warrant of the Secretary of War as thé evidence of his- title. There is nothing singular in the form of this quasi-commission, for in the consular service vice-consuls and consular agents receive similar evidences of title to their respective offices. Through the appointment which it evidences the cadet has under existing laws vested rights in his office of which no superior can deprive him, except in the mode prescribed by law, and for faults or negligences of his own.
The learned counsel for the claimant, in his elaborate brief, refers to the origin of the title “ cadet,” and to the rise and growth of that grade in the Army. The examination which he invites is instructive. The first Congress under" the Constitution continued for one year the Army of 840 men, then in existence. (1 Stat. L., 95; 12 Am. State Papers, 5.) Power was then given to enlist an army for three years, a portion of which was to consist of a battalion of artillery. (1 Stat. L., 119.) When the term of enlistment for this artillery corps was about to expire Congress authorized its enlargement by enlistments for three years, to the number of 992 in all, exclusive of commissioned officers. {Act of May 9, 1794, 1 Stat. L., 366.) The newly-created force was to be organized into four battalions of four companies each, with regimental, battalion, and company officers, and was to be denominated the Corps of Artillerists and Engineers. The company officers were to consist of one captain, two lieutenants, two cadets, four sergeants, and four corporals for each company. Each company was to have 42 privates, sappers, and miners, 10 artificers, and 2 musicians, or 54 men below the grade of corporal. Add to these the 4 sergeants and the 4 corporals, and we have 62 men. Multiply 62, the number of men in each company, by 16, the number of companies, and we have 992.
Thus it is demonstrated mathematically that the 32 cadets formed no part of the 992 men who were to constitute what remained of the company after excluding its commissioned officers. The conclusion is inevitable that they were to be themselves a part of the enumerated excluded body; and thus we find the cadet, on his first appearance in the Army, treated by Congress as a commissioned officer.
The Executive also so regarded him, or at least did not look upon him as a non-commissioned officer or private; for in the *218 estimates for 1798 the War Department asks Congress to appropriate for clothing in the artillery regiment of “32 cadets and 1002 non-commissioned officers and privates,” and in an enumeration of the 1002 men it appears affirmatively that they constituted all the non-commissioned officers and privates in the corps, and that the cadets did not form part of them. (12 Am. State Papers, 122.)
In the sixth section of the Act July 16,1798 (1 Stat. L., 604), which was passed a few weeks later than this estimate, the cadet is undoubtedly classed among non-commissioned officers and privates. The claimant’s counsel lays great stress on this fact as showing the final determination of Congress; but in view of its manifest connection with previous legislation, and of the subsequent repeated explicit declarations of Congress to the contrary, we think it is entitled to no weight.
It is found in a section whose object is to increase the pay of non-commissioned officers and privates over those fixed by the act of March 3,1705, in which the cadet was not mentioned. (1 Stat. L., 431.) With this purpose in view, the word “officers,” which had been used in the previous act, is omitted in the general descriptive language, and the term “non-commissioned officers,” &c., descriptive of the various classes whose pay was to be raised, was retained.
Shortly before the passage of the act of 1798 the Secretary of War wrote to the chairman of the Congressional Committee of Defense that it was supposed that cadets would form a nursery from which qualified officers would be drawn, and that it was desirable to increase their pay. (12 Am. State Papers, 129.) The Secretary’s suggestions were incorporated in that part of the act of July 16,1798, which provided for the increase of the pay of non-commissioned officers and privates; but in view of the haste and inadvertence with which legislation is sometimes made, it would be wrong to infer that Congress intended by this collocation in the act to reverse a well-digested policy, founded upon the soundest principle.
If the act of 1798 threw any real doubt on the purpose of Congress, that doubt was removed by the Act April 12, 1808 (2 Stat. L., 481), which authorized the President to raise regiments of infantry, artillery, riflemen, and dragoons, with cadets in each regiment. In providing for the pay of these regiments it is enacted that “ the compensation of the officers, cadets, non- *219 commissioned officers, musicians, artificers, and privates authorized by this act shall be,” &c. The classification thus made is three times repeated in the act, and again occurs in the seventh section of the act of January 11, 1812. While it takes the cadet out of the rank of commissioned officers, where he was put by the act of 1794, it leaves him in a grade by himself, as an officer between the commissioned and the non-commissioned officer. There he has continued; and we have seen that existing law still makes him an officer identical with his classification in these early acts.
The acts concerning the Military Academy contain nothing inconsistent with this view. The Act March 18, 1802 (2 Stat. L., 132), directed a Corps of Engineers to be organized in which there were to be ten cadets, and the corps was to constitute the Military Academy. The cadets already in the Army were not disturbed by this act. It is evident that the ten new cadets were not to find their way into the Army by enlistment, for the words “organize” and “establish” were used both with reference to them and to the regimental and other officers. A year later, however, Congress desired to add artificers and privates to this corps, and then it made use of the technical word “ enlist” (Act February 28, 1803, 2 Stat. L., 206), which it had not employed to define the engagement of the cadet.
Under the Act April 29, 1812 (2 Stat. L., 720), from which the real existence of the Academy in its present form dates, and which contains the most important provisions codified in the Revised Statutes, the various branches of cadets were gathered into one body of students at West Point. The cadet disappeared as a feature in company organization in the Army, and was soon legislated out of that organization (3 Stat. L., 615); but his status toward the government and his rank in the service remained unchanged.
One further consideration is equally fatal to the claimant. In the recent case of Fendall v. The District of Columbia, our brother Richardson, on behalf of the court, said:
“The court cannot avoid taking judicial notice of passing evehts of great public interest and widespread notoriety, well known and familiar alike to suitors, counsel, and judges, and of the commonly understood meaning of words and jihrases specially applied to particular subjects and things in'the community and among business people, when such words and phrases are introduced into statutes legislating upon those subjects.”
*220 If we had any doubt that a cadet is not generally regarded as an enlisted man, and that that term is not used in the community in a sense which includes him, our doubts would be removed by the admissions in the argument of the claimant’s counsel. But we have no doubt that when Congress used that term it did not understand that it was employing a term applicable to the members of the Military Academy, and it is our duty to give the words a judicial construction in harmony with the popular sense in which Congress employed them.
Some of the propositions in the claimant’s brief deserve notice before closing this opinion, already extended to an unexpected length.
I. He says, in substance, that signing articles of agreement to serve in the Army and taking an oath is the form of enlistment; that the cadet does both on his admission to the Academy, and that therefore he is an enlisted man. p If it were true that all persons who sign articles to serve in the Army, and take an oath, thereby enlist, the argument would be sound. But we have seen that only those enlist who agree in manner provided by law to serve for the time indicated in the statutes as privates or their equivalent, like non-commissioned officers, hospital stewards, Indian scouts, &c. The cadet does not engage to serve as a private. On the contrary the government agrees with him that he shall hold a commission for a portion of his engagement, if he conducts himself properly and there is a vacancy.
II. That cadets may be ordered by the President into the field as other forces are. The acts placing them in the Army (§ 1094), and under the directions of the President (§ 1323), must be construed with reference to the objects for which the corps is created and the duties assigned to it by statute. The general power is restrained by the duty imposed upon the President to cause the cadets to be arranged into companies and trained in the duties indicated by statute. And if the President, in the exercise of supreme power, may order cadets into the field, as he may the commanding general, it no more follows that the cadet becomes a common soldier than that the general does in such cases.
III. That they are entitled to pensions for wounds and disabilities incurred in the line of their duty. An opinion of Mr. Wirt (1 Opin., 348), is cited in support of this position. That *221 opinion related to an act wliicb entitled officers to such pensions, and Mr. Wirt’s conclusion might well have been sustained on that ground. So far as it holds cadets to be enlisted men it is clearly wrong.
IY. That since the act of June 18,1878, the Secretary of War has, in the Army Register, given an executive construction of the act favorable to the claimant. It may well be questioned whether the alleged act amounts to such a construction; but even if it were so, it would be too recent to be entitled to weight.
Y. That while at the Academy cadetsperform the dutiesof common soldiers. This is a necessary part of an officer’s instruction, without which the cadet’s education would be incomplete. He is also required to be trained in the duties of an officer; but it does not follow that the performance of those duties makes him an officer.
YI. That they are governed by the Rules and Articles of War, and are liable to be tried by court-martial in like manner as other soldiers.
The act of March 16,1802, made the ten cadets authorized by it a part of the Engineer Corps, and the Engineer Corps a part of the Army. The cadets attached to other corps were likewise in the Army. As such they were governed by the Rules and Articles of War prescribed by the Act April 10, 1806 (1 Opin., 286.) The Act April 29, 1812 (2 Stat. L., 720), brought the cadets together, but made no change in their subjection to the Articles of War.
The Revised Statutes also expressly subject them to courts-martial; by section 1326 to general court-martial; and by article 82 of the Articles of War to a garrison court-martial. No difficulty is suggested until we come to consider for what offenses they are justiciable.
Prior to the Revised Statutes they were, like any other soldier, justiciable by. a court-martial for any violation of the Articles of War. But the section introductory of the Articles of War in the Revised Statutes, sectionl342, contains these words: “The armies of the United States shall be governed by the following rules and articles: The word officer, as used therein, shall be understood to designate commissioned officers; the word soldier shall be understood to include non-commissioned .officers, musicians, artificers, and privates, and other enlisted men,” and it is argued that as a cadet is not a commissioned or *222 n non-commissioned officer, or a musician, artificer, or private, be is not subject to tbe Articles of War unless be is an enlisted man.
Tbis presents no real difficulty. Uo one supposes for an instant that Congress did not intend to subject tbe cadets to tbe Articles of War. If it were necessary, in order carry into effect tbe undoubted legislative will, it might be beld that a cadet is an enlisted man for tbe purposes of section 1342 of the Revised Statutes, but that be is not one in any other relation to statute law.
It is not, however, necessary to resort to such a construction. Tbe purpose of tbe enumeration under tbe word soldier is manifest. Without it there would have been a doubt whether musicians, artificers, and other enlisted men, such as hospital stewards and Indian scouts, were subject to tbe articles. Tbis enumeration made it clear that every enlisted man was to be subjected to them.
It will be observed that tbe statute uses a different verb in tbe two cases. Tbe word officer is to be understood to “designate” commissioned' officers; that is, to point out or specify tbis particular class of officers to tbe exclusion of all others. But as to tbe word soldier, tbe statute only says that it is to “exclude” certain enumerated classes; that is, that all those classes are to be included, although some of them in common parlance are not regarded as soldiers. Tbis does not necessarily exclude other soldiers. Tbe Commanding General of tbe armies and tbe humblest private are alike soldiers, and as such are alike made subject to tbe Articles of War by that provision of section 1342 of tbe Revised Statutes which says: “Tbe armies of tbe United States shall be governed by tbe following rules aud articles.” Tbe section next provides that tbe Commanding General and other commissioned officers shall be designated in tbe articles as “officers.” It then furnishes one other designation, namely, “ soldiers,” as applicable to every other person subject to tbe articles, and finally it provides that all classes of enlisted men shall, under tbe generic name soldier, be subject to tbe articles, although not commonly regarded as soldiers. Tbis seems to us to be tbe construction of tbe act most natural, most reasonable, and most in accordance with tbe evident intent of tbe legislature.
Tbe logical conclusion from tbe foregoing would be judgment *223 for the dismissal of the petition. But as the amount in controversy is only $536.47, and as the claimant’s counsel represents that this is a class case, and moves for the entry of a proforma jugdment in the claimant’s favor in order to afford an opportunity for a review, and as the counsel for the government consents to the entry of such a judgment, it is therefore ordered, pro forma, that the claimant do have and recover of the defendants the sum of five hundred and thirty six dollars and forty-seven cents.
Hunt, J., was absent by reason of illness when this case was tried, and took no part in the decision.