**HOEPPEL et al. v. UNITED STATES.***
No. 6625.

United States Court of Appeals for the
District of Columbia.
Decided May 18, 1936.

Rehearing Denied May 28, 1936.

Motion for Amplification of Record
Denied June 8, 1936.

Samuel A. King, Arthur G. Brode, H. Max Ammerman, and Kenneth N. Parkinson, all of Washington, D. C., for appellants.

Leslie C. Garnett, David A. Pine, and Samuel F. Beach, all of Washington, D. C., for the United States.

Before MARTIN, Chief Justice, and VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

VAN ORSDEL, Associate Justice.

This is an appeal by John H. Hoeppel, a Representative in Congress from the

*Writ of certiorari denied 57 S. Ct. 123, 81 L.Ed. ——. Rehearing denied 57 S. Ct. 188, 81 L. Ed. ——.

Twelfth District of California, and his son, Charles J. Hoeppel, from a conviction in the Supreme Court of the District of Columbia of conspiracy to violate section 150 of title 18, United States Code, 18 U. S.C.A. § 150 (44 Stat. 918, § 2).

The indictment alleges, in substance, that on May 23, 1934, and continuously thereafter to and including June 6, 1934, Charles J. Hoeppel, alias Charles Alexander, and John H. Hoeppel conspired together that Charles J. Hoeppel should solicit for personal emolument from one James W. Ives the payment of the sum of $1,000, in consideration of the support and influence of Charles J. Hoeppel in obtaining the appointment of Ives to the Corps of Cadets of the United States Military Academy. Three overt acts are then charged. The first is that, on May 31, 1934, Charles J. Hoeppel conferred with Ives in the District of Columbia. The second is that on May 31, 1934, and in the District of Columbia, John H. Hoeppel procured the signature of Representative John H. Burke to a letter of that date nominating Ives to West Point. The third is that, on May 31, 1934, and in the District of Columbia, John H. Hoeppel procured the signature of Representative Burke to a letter of that date, transmitting to the Adjutant General the nomination of Ives referred to in the second overt act.

It appears that John H. Hoeppel entered into an agreement with John H. Burke, a Representative in Congress from the Eighteenth District of California, to exchange a West Point nomination for a nomination to the Naval Academy. In accordance with this arrangement, Burke, on December 5, 1933, at the instance of John H. Hoeppel, signed a letter nominating Charles J. Hoeppel to the Military Academy, and John H. Hoeppel, at the instance of Burke, signed a letter nominating one John Lineberger to the Naval Academy. Each nominee failed to pass his examination. Notification of Charles J. Hoeppel's failure was sent to him on May 1, 1934.

In May, 1934, one James W. Ives, a resident of Baltimore, Md., being desirous of entering the Military Academy, obtained from General Conley, assistant to the Adjutant General at the War Department, a list of Representatives having vacancies at West Point. In canvassing the offices of these Representatives, Ives visited the office of John H. Hoeppel. He did not see Hoeppel, but left his name and address. Late in May, 1934, Ives returned to Washington and was introduced by General Conley to Colonel Bamberger of the Adjutant General's office, who had recently canvassed members of Congress and obtained a nomination to West Point for his son. At the suggestion of Colonel Bamberger, Ives sent a letter to John H. Hoeppel, dated May 22, 1934, which was put in evidence by John H. Hoeppel at the trial. In this letter Ives submitted his educational qualifications, which he stated were sufficient to exempt him from the educational examination, and expressed confidence in his ability to pass the physical examination. At the bottom of this letter Colonel Bamberger wrote a note to one Blade, then secretary to John H. Hoeppel, to the effect that Ives was the young man in whom General Conley was interested, signing it "Bamberger."

Ives then returned to Baltimore, where a letter reached him dated "5-25-34"; the envelope being postmarked "May 26, 1934." This letter was signed "Charles Alexander," and stated that the writer would be in Baltimore on May 30th to discuss with Ives a subject in which the writer understood he was vitally interested, asking that Ives "stand by," so that the writer's journey would not be "lost motion."

On May 30, 1934, Ives received a telephone call from Charles Alexander, who stated that he had heard that Ives was anxious to obtain an appointment to West Point, and that he had one which would cost $1,000 if Ives were interested. Ives asked him to come to his home, and within ten or fifteen minutes he arrived. He was asked by Ives, in the presence of Ives' brother, about a smaller sum, but said he would not take less than $1,000. Ives agreed to that sum, and made an appointment to meet him in Washington the next morning. In this connection Alexander mentioned Representative Hoeppel's name, and said he had received a letter from Ives about this appointment. He explained that he had spent quite a lot of money preparing for the appointment he had received, and that Representative Hoeppel had told him he could dispose of the appointment to any person he wanted to, in order to take care of this expense. Alexander then gave Ives a Washington telephone number—Cleveland 0128. This was the number of the telephone in the apartment occupied by John H. Hoeppel, but it was not listed in his name.

Ives came to Washington on May 31, 1934, and called Cleveland 0128 from the Union Station. A woman's voice answered the telephone and, upon Ives' asking for Charles, or Charles Alexander, said that he was out. When Ives gave his name and stated where he was, the woman said that Charles would meet Ives in fifteen or twenty minutes and that Charles wanted Ives' correct age, which Ives then gave. In about fifteen minutes Ives met Charles at the Union Station, at which time Charles presented Ives with a letter of nomination for West Point, dated May 31, 1934, and signed by Representative Burke. This letter of nomination gave Ives' correct age, and gave as his California address the same address which was given for Charles J. Hoeppel in the letter nominating him the preceding December. Charles then handed Ives a promissory note, under the terms of which Ives agreed to pay Charles Alexander $1,000 for services rendered in obtaining a West Point appointment. Ives signed the note and returned it to Charles. He also at that time wrote a letter in longhand to Representative Burke, asking Burke for the appointment. This letter was requested by Charles, who furnished the paper on which it was written. This letter, which was put in evidence by John H. Hoeppel, is dated "Thursday," which is the day on which May 31, 1934, fell.

About the same date John H. Hoeppel went to Representative Burke and told him that he had another boy to name in place of his son, who had failed. Hoeppel had all the nomination papers fixed up, and Burke signed them pursuant to his agreement. On this occasion Burke signed the letter nominating Ives, which was handed to Ives by Charles Alexander in the Union Station, together with a letter on Burke's stationery transmitting the nomination. John H. Hoeppel had previously requested and received a supply of Burke's stationery.

After the exchange of the note for the letter of nomination, Ives went to the War Department and saw General Conley, who arranged for the acceptance of his nomination and gave him papers to fill out. Ives then returned to Baltimore. On June 5, 1934, after consulting with some friends, he came back to Washington to resign his nomination. He called Cleveland 0128 and asked for Charles, but was informed that he was not in. He telephoned again that evening and got Charles on the telephone. A meeting was arranged, after which they went to the Willard Hotel, where Ives told Charles that he had been advised and that he realized that it was illegal to give money for a West Point appointment, and that he wanted the note back and to get the appointment legally. Charles then suggested several ways in which the money could be paid legally, one of which was to send it to Representative Hoeppel as a campaign contribution; another way was to send it to some philanthropist in the West, who would transmit it to Charles. Ives refused to enter into any of these arrangements, stating that he had made up his mind that it was illegal to pay money for the appointment, and that he could not go on that way.

The next morning Ives went to the War Department, where he saw General Conley, General McKinley, and Colonel Bamberger, and made a statement to them. On the advice of these officers he then went to see Representative Burke. He did not see Burke, but talked with his secretary, a Mrs. Redmond, to whom he revealed the entire transaction. She informed Ives that the nomination belonged to John H. Hoeppel, and suggested that Ives see him. Mrs. Redmond then telephoned Hoeppel and made an appointment for Ives, but without disclosing the reason Ives wished to see Hoeppel. Ives went around to Hoeppel's office. There were eight or ten people in the outer office and Representative Hoeppel was standing in the outer office. He greeted Ives and invited him into the inner office. Ives had not given his name and had never seen John H. Hoeppel before. Hoeppel said that he knew what Ives was there for, and typed out a letter which Ives read and found was a letter of resignation. After reading the letter, Ives inquired if he could not receive the appointment legally, to which Hoeppel replied, "Well, as long as you don't wish to carry out the agreement, you cannot have the appointment. You are right back where you started a week ago." After this conversation, Ives signed the letter of resignation.

On the same day Burke's secretary told him what Ives had said to her, and Burke thereupon telephoned John H. Hoeppel and told him that Ives had been to his office and told his secretary that he (Ives) had promised to give $1,000 for the nomination which Burke had recently signed for John

H. Hoeppel: Burke asked Hoeppel what about it, and Hoeppel replied, "Oh, don't pay any attention to him, Burke; he's crazy." The same day Hoeppel went to Burke's office with a letter cancelling Ives' nomination, which letter Burke signed, and at that time Hoeppel said to Burke's secretary that Ives was mentally deficient, to which she replied, "He qualified for the Academy; he cannot be." Hoeppel said, "The boy is crazy."

Burke never met Ives until shortly before the trial of this case. Ives first learned that Charles Alexander was Charles J. Hoeppel upon being shown a team photograph by an agent of the Department of Justice, at which time Ives picked out Charles Alexander in the photograph and was told that he was Charles J. Hoeppel.

Charles J. Hoeppel did not take the witness stand. John H. Hoeppel testified, giving a different version of what took place when Ives signed the letter of resignation and contradicting the testimony of Ives as to what was said. The wife of John H. Hoeppel gave testimony tending to show that Ives had not called Cleveland 0128 on May 31, 1934. Raymond W. Hoeppel, another son of John H. Hoeppel, gave testimony tending to corroborate John H. Hoeppel's version of what occurred when Ives signed his resignation, claiming that he was seated just outside the door to John H. Hoeppel's inner office and overheard what occurred between his father and Ives.

It is contended by counsel for the defendants that the indictment in this case does not charge a conspiracy to commit an offense against the United States, because an appointment to the Corps of Cadets of the United States Military Academy does not come within the purview of section 150, tit. 18, U.S.C. (18 U.S.C.A. § 150), which provides as follows:

"It shall be unlawful to solicit or receive from anyone whatsoever, either as a political contribution, or for personal emolument, any sum of money or thing of value, whatsoever, in consideration of the promise of support, or use of influence, or for the support or influence of the payee, in behalf of the person paying the money, or any other person, in obtaining any appointive office under the Government of the United States."

It is argued first, that this statute relates only to civil officers, and, secondly, that a cadet of the United States Military Academy does not hold an "appointive office under the Government of the United States." In support of the first point great stress is laid upon section 21a, tit. 5, U.S. C. (Act Dec. 11, 1926, § 1, 44 Stat. 918), which was enacted on the same date as section 150, supra, and which, as originally passed, provided in part as follows:

"That each individual hereafter appointed as an officer of the United States by the President, by and with the advice and consent of the Senate, or by the President alone, or by a court of law, or by the head of a department, shall, within thirty days after the effective date of his appointment, file with the Comptroller General of the United States an affidavit stating that neither he nor anyone acting in his behalf has given, transferred, promised, or paid any consideration for or in the expectation or hope of receiving assistance in securing such appointment." 44 Stat. 918, § 1.

"Sec. 2. No salary shall be paid to any individual required under section 1 [section 21a of this title] to file an affidavit until such affidavit has been filed." 44 Stat. 919 (5 U.S.C.A. § 21b).

By the Act of March 2, 1927 (44 Stat. 1346), section 21a was amended (5 U.S.C. A. § 21a) by deleting the word "an" before the word "officer" and inserting in lieu thereof the words "a civil," thus making the statute read, "a civil officer." It is insisted that this amendment shows an intent on the part of Congress to limit the application of section 150 to civil officers of the United States.

We are not impressed by this contention. Section 150 is not ambiguous. In it Congress has plainly and clearly forbidden the solicitation or receipt of money in consideration of the use of influence "in obtaining any appointive office under the Government of the United States." The statute being clear and unambiguous, there is no room for construction; there is no occasion to refer to its legislative history, or to other statutes and their histories, or to the other sources resorted to by defendants. To do so would be to create an ambiguity, not to remove one. United States v. Mo. Pac. R. Co., 278 U.S. 269, 277, 278, 49 S.Ct. 133, 73 L.Ed. 322; Thompson v. United States, 246 U.S. 547, 551, 38 S.Ct. 349, 62 L.Ed. 876; Caminetti v. United States, 242 U.S. 470, 485, 490, 37 S.Ct. 192, 61 L.Ed. 442, L.R.A. 1917F, 502, Ann.Cas.

1917B, 1168. Defendants' argument in this connection is in effect, that we should read the word "civil" into section 150. This we cannot do, since it would amount to judicial legislation. Hobbs v. McLean, 117 U.S. 567, 579, 580, 6 S.Ct. 870, 29 L. Ed. 940; Maxwell et al. v. Moore et al., 22 How. 185, 191, 16 L.Ed. 251.

We see nothing making these two statutes dependent upon each other, although they were enacted on the same date. Section 150 is a penal statute, prohibiting the solicitation and receipt of money in consideration of the promise of support or use of influence in obtaining any appointive office under the government of the United States. It is broad and sweeping in its terms, applying to all appointive offices, without qualification. Section 21a, on the other hand, is a civil statute, requiring appointees to civil offices, before they can draw their salaries, to file, within a month after receiving their appointments, affidavits stating that they have neither promised nor paid any consideration for assistance in securing their appointments. This section exempts military and naval officers because of the hardship which the time element would impose upon them.

Defendants' second point in this connection is that a West Point cadet is not the holder of an appointive office under the government of the United States; in other words, that he is not an officer of the United States.

In support of this contention great reliance is placed upon Hartigan v. United States, 196 U.S. 169, 25 S.Ct. 204, 49 L. Ed. 434. This decision does not sustain defendants' position. It does not decide whether a cadet is an officer of the United States; it merely holds that a cadet is not an officer of the Army so as to entitle him to the protection of a general court-martial before dismissal, as provided by article 99 of the Articles of War.

Nor does Babbitt v. United States, 16 Ct.Cl. 202, 203, lend support to defendants' contention. Defendants argue that this decision "clearly shows that a cadet is not an officer in contemplation of law but is merely a student, subject to military discipline." Defendants misinterpret this decision. The court held that a cadet is neither a commissioned officer, nor a non-commissioned officer, nor a common soldier of the Army, but is an inferior officer, who, for purposes of instruction, may be required to serve in any of these capaci-

ties. In the course of its opinion in that case the court said (16 Ct.Cl. 202, at page 216):

"Being thus required to serve for a term, during one-half of which he is to be trained in the duties of an officer, and during the remainder of which he may serve as a commissioned officer, and being appointed to his post by the President, a cadet is, in our opinion, an officer—one of that class of inferior officers alluded to in Collins v. The United States (14 Ct. Cl. 568), in which the subject of appointment to such offices was fully discussed. He is never a part of the rank and file of the Army which is to be led; on the contrary, his destiny from the outset is to be among the officers or leaders, for which alone he is educated and trained. The radical test of his relation to the government is this—that he is appointed by the President. The second section of the second article of the Constitution empowers Congress to vest the appointment of inferior officers by law in the President alone. Congress has exercised its power in this respect in the very language of the Constitution. It has enacted that the corps of cadets 'shall be appointed by the President.' (Rev.Stat., § 1315). In our opinion, this as clearly makes each member of that corps an inferior officer as if the statute proceeded to declare him so."

Defendants fail to distinguish between an officer of the Army and an officer of the United States. An officer of the Army, as the term is generally understood, means a commissioned officer. No claim is made that a cadet is an officer of the Army. A cadet, in so far as his relation to the Army is concerned, is a mere "inchoate" officer (West Point Cadets, 7 Op.Attys.Gen. 323) who may attain to the status of an officer of the Army upon the satisfactory completion of his training and receipt of his commission.

We think it is well settled that a person in the service of the United States, who has been appointed in any of the modes prescribed in article 2, § 2, cl. 2 of the Constitution, is an officer of the United States, and, conversely, that any person in the service of the United States who has not been so appointed is not, strictly speaking, an officer of the United States. United States v. Mouat, 124 U.S. 303, 307, 8 S.Ct. 505, 31 L.Ed. 463; Scully v. United States (C.C.) 193 F. 185, 186, 187; McGrath v. United States (C.C.A.) 275 F.

294, 300, 301. By section 1091, tit. 10, U. S.C. (10 U.S.C.A. § 1091) (40 Stat. 894), Congress provided that the Corps of Cadets of the United States Military Academy "shall be appointed by the President." We are therefore clearly of the opinion that a member of the cadet corps is an officer of the United States, a member of that class described as "inferior officers" by the Constitution, and that his office comes within the purview of section 150, tit. 18, U.S.C. (18 U.S.C.A. § 150).

■ It is next contended that the evidence is insufficient to sustain a conviction of conspiracy. Without stopping to review the voluminous testimony, we are satisfied, from a careful examination of the record, that the trial justice committed no error in refusing to grant defendants' motion for a directed verdict. While the evidence in the case is largely circumstantial, as is true in most conspiracy cases from the very nature of the charge (Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 612, 34 S. Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788), we think that it disclosed conduct and statements of defendants co-operating together to an unlawful end, inconsistent with any reasonable hypothesis of innocence.

■ Defendants further contend that the admission of the testimony of Ives as to acts and statements of Charles J. Hoeppel, alias Charles Alexander, occurring out of the presence of John H. Hoeppel, was error. It is argued that this testimony was received before the conspiracy charge had been prima facie made out. This, however, was not error, since it went to the order of proof, which lies largely within the discretion of the trial court. Thiede v. Utah, 159 U.S. 510, 519, 16 S.Ct. 62, 40 L.Ed. 237; Taylor v. United States (C.C.A.) 89 F. 954, 956; Safarik v. United States (C. C.A.) 62 F.(2d) 892–896.

Nor is the objection to this testimony, on the ground that the government attempted to establish the conspiracy as against John H. Hoeppel by acts and declarations of an alleged coconspirator, well taken. The testimony as a whole established prima facie John H. Hoeppel's complicity in the conspiracy, by evidence aliunde the acts and declarations of Charles J. Hoeppel as recounted by Ives; that is, by John H. Hoeppel's own statements to Ives on June 6, 1934, together with the surrounding circumstances. While it is

true that these statements were denied by Hoeppel, it was, of course, a question for the jury to determine, and they have found against him.

■ A conspiracy may well be established by the declarations of a coconspirator, when taken together with evidence of the conduct of the parties and other circumstances. In Cummings v. United States (C.C.A.) 15 F.(2d) 168, 169, the court said:

"Defendants rely upon the proposition that the formation of the conspiracy could not be established by declarations of the defendants. True, a declaration by a single defendant would not be competent as against the others, or sufficient in itself to prove the conspiracy. But, in harmony with the court's instructions, if they each and all, though separately, admitted or declared the existence of the alleged conspiracy, such declarations would be competent, and, taken together with the conduct of the parties and other circumstances, might very well constitute the most convincing evidence."

■ The order in which evidence is received, as we have observed, is within the sound discretion of the trial court, and the ultimate collocation of all the evidence is for the jury. Chadwick v. United States (C.C.A.) 141 F. 225, 241. Viewing the whole evidence in this case, we think that it conclusively showed a conspiracy, and that therefore the acts and declarations of Charles J. Hoeppel were admissible against his coconspirator, John H. Hoeppel.

■ There is no merit in defendants' contention that the testimony with reference to the three overt acts charged in the indictment does not tend to prove the conspiracy. An overt act, as well as the circumstances under which it is committed, may always be considered in connection with other evidence in the case in determining whether or not a conspiracy existed. Langer v. United States (C.C.A.) 76 F.(2d) 817, 826; Langley v. United States (C.C.A.) 8 F.(2d) 815, 820. Nor is it essential that an overt act should be a substantive offense in order to furnish proof of the conspiracy. It need only be an independent act subsequent to the formation of the conspiracy and in furtherance thereof. Dahly v. United States (C.C.A.) 50 F.(2d) 37, 42.

■ We think it unnecessary to prolong this opinion by a detailed discussion of the

claim that one of the assistant United States attorneys who conducted the prosecution was guilty of misconduct in his final argument to the jury. The statement made by him was induced by a statement made to the jury by one of defense counsel. While these statements, and particularly the one by the assistant district attorney, probably transcended the bounds of proper argument, any effect upon the jury resulting from the statement complained of was cured by the prompt action of the trial court when, in refusing to declare a mistrial, he admonished the jury as follows:

"I refuse the request and instruct the jury to disregard the opinion of the counsel in the case that they may have set forth in the heat of argument and remember that the case is to be decided on the testimony of the witnesses and the law as given by the Court. You will disregard entirely the statement of counsel, and the similar statement made by counsel for the defense. You will disregard that also."

And in his charge to the jury the court said:

"You are not to be affected by the arguments of counsel to the extent of stirring up your feelings, and neither are you to take their opinions as your opinions. You can give due consideration to what counsel have said, but your verdict is to be based not upon the opinions of counsel, not upon their arguments, and not upon any words which in the heat of argument they may have said or through which in any way they may have characterized any of the parties or witnesses in this case."

We have carefully considered the other points raised by defendants and find them to be without merit.

The judgment is affirmed.