MAY v. UNITED STATES.

GARSSON v. UNITED STATES
(two cases).
Nos. 9610–9612.

United States Court of Appeals
District of Columbia Circuit.

Decided Jan. 24, 1949.

STEPHENS, Associate Justice, dissenting.

998

Mr. Warren E. Magee, of Washington, D. C., with whom Mr. Daniel J. Anderson, of Washington, D. C., was on the brief, for appellant May.

Mr. Charles J. Margiotti, of Pittsburgh, Pa., pro hac vice, by special leave of court, with whom Messrs. Allen J. Krouse and Perry W. Howard, both of Washington, D. C., were on the brief, for appellants Garsson.

Mr. William A. Paisley, Special Assistant to the Attorney General, with whom Messrs. John T. M. Reddan and Bernard J. Vincent, Special Assistants to the Attorney General, were on the brief, for appellee. Mr. George Morris Fay, United States Attorney, and Mr. Sidney S. Sachs, Assistant United States Attorney, both of Washington, D. C., also entered appearances for appellee.

Before STEPHENS, EDGERTON and PRETTYMAN, Associate Justices.

PRETTYMAN, Associate Justice.

These are three appeals from judgments of the District Court of the United States for the District of Columbia (now the United States District Court for the District of Columbia) in criminal cases. The indictment upon which appellants were tried, convicted and sentenced, was in four counts. A motion for acquittal was granted as to the second count, the prosecutor electing to stand upon the third count as an alternative. The cases are thus before us on Counts I, III and IV. Four persons were indicted and tried. The court entered judgment of acquittal as to one, Joseph F. Freeman. The cases before us, therefore, concern the other three persons, each having entered an appeal from his conviction.

Appellant May was a member of the House of Representatives and Chairman of its Committee on Military Affairs. Appellant Henry M. Garsson was an officer, director and stockholder in two corporations, Erie Basin Metal Products, Inc., and Batavia Metal Products, Inc., which were engaged in the production of war materials under contracts with the War Department. Appellant Murray Garsson was an employee of those corporations.

Count I of the indictment charged that appellants conspired together to commit offenses against the United States,[1] that is, to violate Section 203 [now § 281] of Title 18 of the United States Code[2] and to defraud the United States. It described the manner of the conspiring and the nature

1 Rev.Stat. § 5440, as amended, 35 Stat. 1096 (1909), 18 U.S.C.A. § 88 [now § 371].

2 Rev.Stat. § 1782, 35 Stat. 1109 (1909), 54 Stat. 1021 (1940): "Whoever, being elected or appointed a Senator, Member of or Delegate to Congress, or a Resident Commissioner, shall, after his election or appointment and either before or after he has qualified, and during his continuance in office, or being the head of a department, or other officer or clerk in the employ of the United States, shall, directly or indirectly, receive, or agree to receive, any compensation whatever for any services rendered or to be rendered to any person, either by himself or another, in relation to any proceeding, contract, claim, controversy, charge, accusation, arrest, or other matter or thing in which the United States is a party or directly or indirectly interested, before any department, court-martial, bureau, officer, or any civil, military, or naval commission whatever, shall be fined not more than $10,000 and imprisoned not more than two years; and shall, moreover, thereafter be incapable of holding any office of honor, trust, or profit under the Government of the United States."

of the defrauding, and alleged the commission of thirty-five overt acts for the purpose of effecting the objects of the conspiracy. Count III alleged that May received from the Garssons and the Erie Company a check of the value of $5,000 as compensation for services rendered them by him in relation to contracts and other matters before the War Department. The act thus committed by May was said to be in violation of the statute just referred to and quoted in footnote 2 below. The indictment alleged that the Garssons aided and abetted him in the unlawful receipt of that compensation. Count IV was similar to Count III and alleged that some $15,000 was received by May as compensation from the Batavia Company and some $38,000 as compensation from the Erie Company, for services in matters before the War Department. It also charged that the Garssons aided and abetted those receipts.

Generally speaking, in the indictment it was alleged that during the years 1942 to 1946 the Garssons and their companies had numerous contracts with the War Department for the production of materials of war, and that they were also interested in commissions, promotions, furloughs and transfers in the Army for relatives and friends. It was alleged that upon numerous occasions May telephoned, called personally or wrote officials of the War Department in respect to these matters in which the Garssons were interested, and brought his official prestige and influence to bear upon those officers in order to promote the interests of the Garssons. It was alleged that from time to time during this period the Garssons paid May large sums of money. It was alleged that these payments were compensation for the services rendered.

It was alleged in the indictment that some of the payments to May were direct, and that some were indirect through the medium of a corporation, the Cumberland Lumber Company, which was organized and operated for the purpose of concealing the payments. It was also alleged that the defrauding of the United States consisted, generally speaking, of defrauding it of its right to have its business conducted honestly and impartially, to have its officials free to transact that business unhampered by dishonest influence, and to have the duties of May as a Congressman performed honestly and impartially.

Appellants present some broad generalizations. They say that all the evidence offered by the Government was incompetent, irrelevant, immaterial and hearsay; that in order to determine the questions presented in their briefs, this court will be required to read the entire record on appeal; and that the trial court erred in denying their written motions to strike each exhibit and all testimony presented by the Government. They say: "Space does not permit a detailed argument covering all the assignments of error made by the defendants throughout the trial. We urge that this Court consider carefully each of these assignments, as we feel they are all meritorious and that the errors complained of therein clearly warrant a reversal of the judgment below."

This court cannot consider points on appeal made in the foregoing fashion. The Rules[3] require that the brief of an appellant shall contain a concise statement of points and an "argument, exhibiting clearly the points of fact and of law being presented, citing the authorities and statutes relied upon." The points must be explicit and must be argued as specific propositions of law or fact. We, therefore, proceed to consider the points presented by appellants in this latter manner.

I. Appellants May and Henry Garsson say that they were immune from prosecution for any alleged offense within the subject matter of their testimony before the "Mead Committee" of the Senate. May appeared and testified voluntarily before that Committee. It seems to be agreed that Henry Garsson was subpoenaed to appear before the Committee. He says in his brief that he "did claim and expressly refused to waive his constitutional privilege before the Committee". No reference to the record upon the point is given us, and the only reference we find is the single statement made by him on the witness stand in his trial that he had testified before the Mead

---

[3] Rule 17(6) and (8) of the General Rules of this Court.

Committee. He did not mention the point in any of his motions to dismiss, for judgment of acquittal, etc. He testified that when he appeared before the grand jury he was told that he had a right to refuse to answer questions, but that he nevertheless answered them. We will assume, without knowing precisely what happened, that when Henry Garsson appeared before the Mead Committee he made a general statement claiming and refusing to waive "his constitutional privilege", but that he then proceeded to testify without further objection or refusal to answer. Murray Garsson did not testify before the Committee.

Appellants' contention is based upon the Fifth Amendment and two statutes. One statute[4] reads:

"No testimony given by a witness before either House, or before any committee of either House, or before any joint committee established by a joint or concurrent resolution of the two Houses of Congress, shall be used as evidence in any criminal proceeding against him in any court, except in a prosecution for perjury committed in giving such testimony. But an official paper or record produced by him is not within the said privilege."

The other statute[5] reads:

"Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and im-

prisonment in a common jail for not less than one month nor more than twelve months."

Total immunity from prosecution is one thing; the admissibility of evidence is another. Some statutes confer the former; for example, that dealt with in United States v. Monia.[6] The statute first above-quoted, 28 U.S.C.A. § 634 [now 18 U.S.C.A. § 3486], pertains exclusively to the admissibility of evidence. It does not in terms confer immunity from prosecution. But appellants say that the two statutes must be read together and that when so read they confer complete immunity from prosecution for any offense within the subject matter of the testimony, because otherwise they would contravene the Amendment.

The leading cases upon the subject are Counselman v. Hitchcock,[7] In re Chapman,[8] Heike v. United States,[9] McGrain v. Daugherty,[10] United States v. Monia,[11] Glickstein v. United States,[12] and Brown v. Walker.[13] We need not attempt to reproduce what those opinions contain. We need only follow the law there laid down.

The problem before us is whether these appellants were entirely immune from prosecution. We are not now discussing the admissibility of evidence.

The Fifth Amendment deals with compulsion to testify against oneself. Experience long ago demonstrated that public authorities must at times, in the public interest, obtain information which might incriminate the informant. They may compel that testimony. But they cannot violate, qualify or limit the Constitution. Therefore, when they compel testimony, they cannot use it against the informant. The Constitution is rigid in this respect.

But not all testimony given public authorities is compelled. Some is given

---

4 Rev.Stat. § 859, as amended, 52 Stat. 943 (1938), 28 U.S.C.A. § 634 [now 18 U.S.C.A. § 3486].

5 Rev.Stat. § 102, as amended, 52 Stat. 942 (1938), 2 U.S.C.A. § 192.

6 1943, 317 U.S. 424, 63 S.Ct. 409, 87 L.Ed. 376.

7 1892, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110.

8 1897, 166 U.S. 661, 17 S.Ct. 677, 41 L.Ed. 1154.

9 1913, 227 U.S. 131, 33 S.Ct. 226, 57 L.Ed. 450, Ann.Cas.1914C, 128.

10 1927, 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580, 50 A.L.R. 1.

11 Supra note 6.

12 1911, 222 U.S. 139, 32 S.Ct. 71, 56 L.Ed. 128.

13 1896, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819.

voluntarily, and some, even though not volunteered, is supplied without objection. The Constitution says nothing about such testimony. It does not provide that what a man says voluntarily may not be used against him. So a statute which deals generally with the use of testimony falls partly within and partly without the scope of the Amendment. In so far as it relates to the use of involuntary testimony, it cannot impinge upon the prohibition of the Amendment. In so far as it relates to the use of other testimony, it is outside the scope of the Amendment and unaffected by it. The Constitution does not require that a statute dealing generally, but exclusively, with the use of testimony be construed to prevent prosecution upon the subject matter of the testimony. The statute first above-quoted, 28 U.S.C.A. § 634, is such a statute.

■ Appellants say, however, that the other statute above-quoted, 2 U.S.C.A. § 192, is so drastic as to make all testimony given before a congressional committee compulsory in character. That statute itself, they say, compels every summoned person to answer all questions. But the Supreme Court has pointed out in the cases we have cited that immunity statutes are not designed as traps for the Government, or to enable guilty persons to escape prosecution by testifying voluntarily. The necessary immunity is as broad as the compulsion and no broader. If Counselman v. Hitchcock, supra, is thought to hold the contrary, that impression is dispelled by Heike v. United States, supra, and subsequent discussions of the subject. It is established that the constitutional privilege must be asserted before an immunity is established. To be liable to the penalties of the statute for refusal to answer, a witness must be asked a question and must refuse to answer. Being then compelled to answer, his immunity arises. Absent refusal to answer followed by compulsion to answer, no immunity arises, either under the statutes before us or under the Constitution.

■■ Appellant May testified voluntarily before the Senate Committee. Appellants make an unsupported statement that some checks and other papers furnished by May to the Committee were offered at the trial by the Government as exhibits, but they give us no record references to any such incident, and we find none. Moreover, since May testified voluntarily, these papers must have been furnished voluntarily. It is not shown that his testimony was compelled. So he had no immunity. Although we assume that Henry Garsson made a general assertion to the Committee that he did not waive his constitutional privilege, it is not shown that he exercised that privilege; he did not refuse to answer any question; so far as the record shows, he was not compelled. So we fail to find that an immunity from prosecution was created for him.

■■ II. Appellants say that the grand jury which indicted them was illegally constituted, because more than half of its members were Government employees, "some" of its members were employees of the General Accounting Office, a department directly interested in this proceeding, and one member was an attorney-at-law.

Rule 6(b)(2) of the Federal Rules of Criminal Procedure[14] provides:

"An indictment shall not be dismissed on the ground that one or more members of the grand jury were not legally qualified if it appears from the record kept pursuant to subdivision (c) of this rule that 12 or more jurors, after deducting the number not legally qualified, concurred in finding the indictment."

The record in the present case shows that 19 jurors concurred in finding the indictment. So that even if the General Accounting Office employees (of whom there were two, including the attorney-at-law) were disqualified, more than 12 jurors concurred. Federal and District of Columbia Government employees are eligible to serve as grand jurors.[15] We therefore find no merit in this point.

---

[14] 18 U.S.C.A. This Rule is a restatement, effective March 21, 1946, of Section 2 of an Act of April 30, 1934, 48 Stat. 649, 18 U.S.C.A. § 554a.

[15] Act of August 22, 1935, 49 Stat. 682, D.C.Code 1940, § 11—420, held constitutional in United States v. Wood, 1936, 299 U.S. 123, 57 S.Ct. 177, 81 L.

III. Appellants say that the trial court erred in denying their motions to suppress certain evidence. As presented to us, the point concerns one stenographer's notebook. Appellants say that there was an illegal seizure and that the book was the personal property of Henry Garsson.

It appears that the Batavia Company was in receivership in a federal district court in Chicago. That court issued a subpoena, addressed to the corporation, for the production of certain papers, etc., before the grand jury. A United States marshal served the subpoena. After consultation with counsel for the company, 21 boxes of books, papers and records were turned over to the marshal. All except one box of stenographic notebooks were subsequently returned to Batavia. One notebook was presented as evidence by the Government at the trial.

On the question whether the notebooks were corporate property or were personal property, Henry Garsson, testifying, was altogether vague about the facts, although he insisted that the books were his personal property. He said that "they may have" contained notes of corporate business; that he did not know what notebooks were in the boxes; and that he did not know what was returned—"I have never looked at what was returned. Cases were returned. I have never seen them. I have never personally examined them." The Government presented a transcription of the stenographic notes in the one book presented. It showed that they related to invoices of lumber for the Cumberland Lumber Company, which was corporate business of the Batavia Company and not personal business of Henry Garsson.

We agree with the trial court that appellants failed to show that the books were illegally seized or that they were personal papers; and this conclusion applies particularly to the one notebook which was offered and admitted in evidence.

IV. Appellants attack the indictment and urge its invalidity upon a number of points. Their first point is that Count I is duplicitous because it charges more than one offense and thus is invalid under Rule 8(a) of the Federal Criminal Rules. This count charges that the defendants "conspired together to commit offenses against the United States, that is, to violate Section 203 of Title 18 of the United States Code, and to defraud the United States". But neither a multiplicity of objects nor a multiplicity of means converts a single conspiracy into more than one offense.[16] In our view, this indictment clearly charges one conspiracy. That the single conspiracy was to commit two offenses makes no difference.

Appellants contend that the conspiracy statute itself[17] describes two offenses. That statute reads: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States * * *." Appellants say that the "either * * * or" shows that Congress meant that a conspiracy to commit an offense against the United States is a different offense from a conspiracy to defraud the United States. We think that the opinion and decision in the Manton case[18] established a rule contrary to this contention. The court was there dealing with this same statute. The argument was that a conspiracy to violate a criminal statute and to defraud the United States was two offenses. The court, quoting Frohwerk v. United States,[19] said: "The conspiracy is the crime, and that is one, however diverse its objects."

Appellants next say that the indictment is duplicitous because Count I is merged into the substantive offenses charged in Counts III and IV. These latter counts, as we have said, charge that the defendant May violated the statute[20] by receiving checks and money from the Garssons and their companies as compensation

Ed. 78. See also Frazier v. United States, 1948, 335 U.S. 497, 69 S.Ct. 201.

[16] United States v. Manton, 2 Cir., 1938, 107 F.2d 834, and cases there cited; Pinkerton v. United States, 1946, 328 U. S. 640, 643, 66 S.Ct. 1180, 90 L.Ed. 1489.

[17] Supra note 1.
[18] Supra note 16.
[19] 1919, 249 U.S. 204, 210, 39 S.Ct. 249, 252, 63 L.Ed. 561, 565.
[20] Section 203 of Title 18 of the United States Code, supra note 2.

for intercession at the War Department in their behalf. It is established that a conspiracy to commit a crime is a different offense from the crime itself.[21] But appellants urge an exception to that general rule. It is that where a crime necessarily involves the mutual cooperation of two persons, and if they have in fact committed the crime, they may not be convicted of conspiracy to commit it.[22] In the case at bar, the statutory offense was the receipt of compensation by the Congressman. He alone could commit that statutory offense. It is true that his act of receiving the compensation could not be performed by him alone; some other person must necessarily give it to him. And so the situation is that although the offensive act necessarily involved the co-operation of two people, the part played by one of them alone is made a criminal offense.

The matter is not free from doubt, but we are of opinion that the answer is indicated by the decisions in United States v. Holte,[23] Ex parte O'Leary,[24] and Vannata v. United States.[25]

In the Holte case, the plaintiff in error was a woman indicted for conspiring to cause her own transportation for purposes of prostitution. The Court held the indictment valid, because it said that the substantive offenses might be committed without the woman's consent. In the course of its opinion, the Court said [236 U.S. 145, 35 S.Ct. 272]:

"But a conspiracy with an officer or employee of the government or any other for an offense that only he could commit has been held for many years to fall within the conspiracy section, * * *. [Cases.]"

The O'Leary case involved a conspiracy to commit bribery, and the appellants relied upon the Dietrich case.[26] The court held that the Holte case had in effect overruled the Dietrich case, and went on to say [53 F.2d 957]:

"To determine whether only the officer could commit the offense which was one of the objects of the conspiracy, we must look to the statutes. Section 207 [now § 202], title 18, U.S.C.A., defines the offense of an officer accepting a bribe. Only the *officer receiving the money* is guilty of the offense defined. Section 91 [now § 201], title 18, U.S.C.A., defines the offense of bribing a United States officer. Only the person who gives the bribe is guilty of the offense therein defined.

"Appellants' argument necessarily assumed that the conspirators named in this indictment were both participants in the crime of accepting a bribe or in the crime of giving the bribe. Inasmuch as one section defines a crime and restricts the offender to the recipient, and the other section restricts the offender to the giver, the contention is fallacious. In other words, applying the language of Justice Holmes in the Holte Case, 'only the government employe could commit the act which was the object of the conspiracy.' There could therefore be a conspiracy between one not an officer and the said officer to commit the crime which the said officer alone could commit."

In the Vannata case, the court held that although the statute made only the sale of liquor a criminal offense, the buyer could be joined with the seller in a conspiracy indictment.

Appellants find some support in the discussion in the Gebardi case.[27] But the court there referred with approval to the Holte, O'Leary and Vannata cases and

[21] Pinkerton v. United States, 1946, 328 U.S. 640, 643, 66 S.Ct. 1180, 90 L. Ed. 1489, and cases there cited.

[22] United States v. Dietrich, C.C.Neb. 1904, 126 F. 664; United States v. Sager, 2 Cir., 1931, 49 F.2d 725; United States v. Katz, 1926, 271 U.S. 354, 46 S. Ct. 513, 70 L.Ed. 986; Gebardi v. United States, 1932, 287 U.S. 112, 122, 53 S. Ct. 35, 77 L.Ed. 206, 84 A.L.R. 370; United States v. Zeuli, 2 Cir., 1943, 137 F.2d 845; Pinkerton v. United States, 1946, 328 U.S. 640, 66 S.Ct. 1180, 90 L.

Ed. 1489. See also 2 Wharton, Criminal Law § 1604 (12th ed. 1932).

[23] 1915, 236 U.S. 140, 35 S.Ct. 271, 59 L.Ed. 504, L.R.A.1915D, 281.

[24] 7 Cir., 1931, 53 F.2d 956, certiorari denied, O'Leary v. United States, 1931, 283 U.S. 830, 51 S.Ct. 366, 75 L.Ed. 1443.

[25] 2 Cir., 1923, 289 F. 424.

[26] United States v. Dietrich, C.C.Neb. 1904, 126 F. 664.

[27] Gebardi v. United States, 1932, 287 U.S. 112, 53 S.Ct. 35, 77 L.Ed. 206.

specifically stated that its decision in the case before it did not rest upon the rule of the Dietrich, Katz[28] and similar cases but rested upon the policy of the Mann Act [now 18 U.S.C.A. §§ 2421-2424] itself.

■ We have before us a conspiracy between private persons and an officer of the Government to commit an offense which he alone could commit. Moreover, the indictment charges a conspiracy not only to violate Section 203 but also to defraud the United States, and the United States can be defrauded without concert of action. For these reasons, we are inclined to follow the Holte and O'Leary decisions.

■ Appellants argue that Counts III and IV are each duplicitous because those counts charge that May received "directly and indirectly" from the Garssons compensation for services rendered. Section 203 [now § 281] of Title 18 says that if a member of Congress shall, "directly or indirectly, receive * * *", etc. Appellants say that this statute, therefore, makes it one offense to receive directly and another offense to receive indirectly and that, therefore, when the indictment says that May directly and indirectly received, it charges two offenses. The same contention is made in respect to the Garssons, because they are charged with aiding and abetting direct receiving and also with aiding and abetting indirect receiving. To follow this contention through its grammatical ramifications is a complicated task. We find no substance in it.[29]

■ Appellants' next contention is that the statute does not provide, and Congress did not intend, that the person who pays compensation to a Congressman for services before Government departments should be guilty of a crime, and that, therefore, the indictment of the Garssons in Counts III and IV, in which they were charged as aiders and abettors, was invalid. They rely on the difference between Section 202 [now § 216], dealing with bribery, and Section 203 (of Title 18, U.S.C.A.), under which this indictment was laid. The former section expressly makes both giving and receiving a bribe a crime. The latter section does not mention the person who pays compensation.

There is a general statute which provides that whoever aids or abets the commission of any act constituting an offense defined in any law of the United States, is a principal in the offense.[30] No language in the statute before us makes an exception to that general provision. To sustain appellants' contention, we would have to write, or read, such an exception into the otherwise unqualified general statute dealing with aiders and abettors. We think we cannot do that.

Appellants' argument in this connection is that where the concert of two people is necessary for the performance of an act which the law denominates a criminal offense, if the statute by specific provision makes only one of those persons liable as an offender, the clear meaning is that the other person shall not be liable in respect to that act; and that a grand jury cannot in such a case make the second person liable as an offender by denominating him an aider or abettor. But the deduction that by its failure to make payment of compensation to a Congressman a crime by direct enactment to that effect, Congress evidenced an intent to exempt such payor from criminal liability, is not a necessary one. It is just as reasonable to assume that Congress, being fully aware of the general law on aiding and abetting, knew that when it made receipt of compensation a criminal offense, it thereby made the payor guilty, because the payor certainly aids and abets the receipt.

Appellants find some support for their position in an analogy to that portion of the opinion in the Gebardi case[31] in which the Court remarked:

"It is not to be supposed that the consent of an unmarried person to adultery with a married person, where the latter alone is

[28] United States v. Katz, 1926, 271 U. S. 354, 46 S.Ct. 513, 70 L.Ed. 986.

[29] Egan v. United States, 1923, 52 App. D.C. 384, 287 F. 958.

[30] Rev.Stat. §§ 5323, 5427, 35 Stat. 1152 (1909), 18 U.S.C.A. § 550 [now § 2].

[31] Supra note 27, 287 U.S. at page 123, 53 S.Ct. at page 38, 77 L.Ed. 206.

guilty of the substantive offense, would render the former an abettor or a conspirator, compare In re Cooper, 162 Cal. 81, 85; 121 P. 318, * * *."

The premise of the Cooper case was that where a statute made criminally liable only one of two persons necessary to the performance of an act, the other person was not made liable by a general statute relating to aiders and abettors. But we think that there is a decisive difference between the intent to be imputed to the legislature in the one case and that apparent in the other. It is well known that the public policy of the several States differs as to criminal liability for adultery, and where a legislature has made plain its intent upon that question, prosecutors should not be permitted to circumvent that decision. But in the case of a concert of action between a Government official and another person, we have no such divergence of policy and we have the pronouncement of the Supreme Court, in the Holte case, above discussed, which was made in 1915 and has not been deviated from.

Appellants urge vigorously the difference between Sections 202 and 203 of Title 18 of the Code. As we have stated, the former makes criminal offenses of both the payment and the receipt of bribes, whereas the latter makes only the receipt of compensation an offense. There is some force in appellants' argument, and if the two sections had been adjoining sections in the same original congressional enactment, there would have been great force in it. These sections were adjoined in the Act of March 4, 1909, which was a codification,[32] but originally they were distinctly separate, one being in acts of July 16, 1862, and February 25, 1863,[33] and the other being in an act of June 11, 1864.[34] The same reasoning which would lead to the conclusion that the dissimilarity of Sections 202 and 203 makes the general statute on aiding and abetting inapplicable to offenses under Section 203, would point to the same conclusion in respect to all other statutes in which only one of two participants is mentioned. We repeat that we do not think that we can write such an exception into the unqualified statute on aiding and abetting.

V. Appellants urge error in the admission of evidence offered by the Government. In part they specify their objections, and in part they generalize. We have examined each of the former class, but we find no error in respect to them. One or two merit brief discussion. Some evidence sprang from what is called the "Greenbrier incident". The objection was that this incident occurred prior to the alleged inauguration of the conspiracy. But the details of the incident were shown by appellants themselves as an explanation of a $2,500 payment shown by the Government to have been made by Murray Garsson to May after the alleged beginning of the conspiracy. Since the payment itself was the overt act which the Government contended constituted compensation from Garsson to May, we do not see how evidence in explanation could make inadmissible the evidence of the payment. It might constitute a defense on the merits, a jury question, but it could hardly eliminate the whole of the Government's proof.

At the close of the Government's testimony, the court directed an acquittal of the defendant Freeman. Appellants contend that thereupon all the evidence concerning Freeman should have been stricken. Freeman was an employee of the Batavia and Erie Companies. He participated in many of the incidents which compose the sum of this case, carrying messages and money for the Garssons to May, etc. Sometimes he was in the company of the Garssons, and sometimes he was acting in their behalf. The court held that there was no evidence tending to show that Freeman knew that the Garssons were buying May's services. But this holding did not mean that all evidence as to Freeman must be stricken. Even if he had never been indicted and had never been charged as having been a conspirator, evidence of his activities as the Washington representa-

---

[32] Secs. 112 and 113 of the Criminal Code, 35 Stat. 1108, 1109.

[33] Rev.Stat. § 1781, 12 Stat. 577, 696.
[34] Rev.Stat. § 1782, 13 Stat. 123.

tive of the Garsson companies would have been admissible.

Appellants say that none of the evidence offered by the Government was admissible, because the prosecutor failed to prove first either the conspiracy or either of the substantive offenses charged in Counts III and IV. Appellants make the same argument in support of their contention that the trial court should have granted their motions for judgment of acquittal.

In respect of Count I, appellants say that there was no evidence of a conspiracy, since (1) evidence of the overt acts was inadmissible to prove the existence of the conspiracy, (2) there was no evidence of a meeting of the conspirators, and (3) the acts, statements and letters of Freeman should have been stricken when Freeman was acquitted.

The Government's position is that the receipt of money by May from the Garssons and the performance of services by May for the Garssons were abundantly proved and not in dispute; that it was for the jury to determine from those elemental facts and the attendant circumstances whether there was an agreement and whether the money was compensation.

■ In support of their position on this point, appellants first say that evidence of the overt acts was inadmissible to prove the conspiracy. The contrary is the established rule.[35] Appellants say that in United States v. Glasser[36] the court held that overt acts might be considered *only* when of such character that they usually indicate a previous plan. We do not find that meaning in that case. The court did say, in reciting the facts, that where overt acts are of a character usually indicating a plan or an agreement, they might be considered evidence of the agreement. But we find no "only" in that opinion.

■ Appellants next say that no criminal conspiracy is shown by the overt acts

since every overt act alleged in the indictment was proved to be proper and legal, that the money involved was fully accounted for by legitimate disbursements, and that the calls and correspondence addressed by May to the War Department were proper, legitimate and for a patriotic motive. That money was received by May from the Garssons is not disputed. The debated question is whether it was received as compensation for services or was for disbursement by May on account of the Garssons or their companies. That was obviously a jury question. We will discuss in a moment whether the evidence was sufficient to send the case to the jury.

■ If the money was received by May as compensation for acts done by him for the Garssons, it is immaterial that those acts were patriotic, legitimate and within the scope of his official duties as a Congressman. We think that the doctrine of the Manton case, supra, controls here. It was there held, in effect, that if a judge receives payment from a party for rendering a correct decision, he is, nevertheless, guilty of a criminal act in receiving a bribe. So, if a Congressman receives compensation for services rendered by him to a person in relation to any matter in which the United States is interested, before any Government department, he is guilty of violating the statute,[37] even though the service rendered was a proper act on his part. A Congressman cannot legally receive compensation from a private person for doing his duty in respect to something in which that person and the United States have interests. The gist of the offense is the receipt of compensation, not the nature of the act done by the recipient in consequence thereof.[38]

■ VI. Appellants contend that the evidence was not sufficient to send the case to the jury and that their motion for judgment of acquittal should have been granted.

---

[35] Hoeppel v. United States, 1936, 66 App.D.C. 71, 85 F.2d 237; McDonald v. United States, 1942, 77 U.S.App.D.C. 33, 133 F.2d 23; Pastrano v. United States, 4 Cir., 1942, 127 F.2d 43; and cases and authorities therein cited.

[36] 7 Cir., 1940, 116 F.2d 690.

[37] Rev.Stat. § 1781, 35 Stat. 1108 (1909), 18 U.S.C.A. § 202 [now § 216].

[38] See also cases such as Sugar Institute v. United States, 1936, 297 U.S. 553, at page 599, 56 S.Ct. 629, 80 L.Ed. 859, wherein the Supreme Court has dealt with the achievement of proper ends by illicit means.

The question here is whether there was evidence from which reasonably minded jurors could determine that beyond a reasonable doubt (1) May received money from the Garssons, (2) he rendered services to them, (3) the money was compensation, and (4) the money and the services were pursuant to agreement which interrelated the two.[39] The weight of conflicting evidence is not for this court. The question is the sufficiency of the Government's testimony to go to the jury and to sustain the verdict.

Appellants do not contradict the elemental facts that money passed and services were performed. They offer explanations for many of the separate transactions and deny all of the Government's inferences from them. Among the facts and the explanations offered were:

(1) A $5,000 check was issued by Erie to Murray Garsson, endorsed by him, and cashed by May in person. $4,000 of the proceeds was deposited to May's personal account in the National Bank of Washington (D. C.). Against this deposit May drew personal checks for personal bills. May said, by way of explanation, that he gave $1,000 of the $5,000 to Freeman for Murray Garsson and that he disbursed the balance for the Cumberland Lumber Company. Part of this balance was $1,300 admittedly retained by May but said by him to have been a reimbursement for $1,300 paid by him to a lawyer named Levine out of a cash fund kept in a safe in his (May's) office. Levine died before the trial. His cash book showed no such item, and his income tax return agreed exactly with his cash book.

(2) A personal check of Murray Garsson for $2,500 was deposited by May in his personal account in the National Bank. When this check was protested, it was made good by a cashier's check bought by Henry M. Garsson. May says that this check related to the "Greenbrier incident", which he says is "unrelated to any charge in the indictment". But the item certainly appeared to be a cash payment by the Garssons to May during the alleged period of the conspiracy and at a time when May was intervening at the War Department in their behalf.

(3) May borrowed $5,000 from Congressman Buckley. In the final analysis, this loan was paid from the proceeds of a check payable to and endorsed by Murray Garsson.

(4) May drew a draft for $1,500 on Batavia in the name of the Cumberland Lumber Company and received the proceeds in person.

(5) May endorsed and deposited in his personal bank account at Prestonburg, Kentucky, three checks payable to the Cumberland Lumber Company: a check of Erie for $3,156.47, a check of Batavia for $1,850, and a check of Batavia for $4,627.60.

(6) The Cumberland Lumber Company affair is an involved matter concerning which the parties are in vigorous dispute. The Government says that the evidence shows the Company to have been a sham to cover financial deals between May and the Garssons. Appellants say that the venture was a legitimate one in which the Garssons embarked and May assisted, altogether for purposes of war production. It is not disputed that May managed a large part, if not all, of the affairs of the Company and that May alone could draw checks on the Cumberland bank account at Prestonburg.

 The foregoing, which is not a complete discussion of all the evidence, is sufficient to indicate that a reasonable mind might fail to perceive any reasonable doubt as to an agreement between May and the Garssons, as to the receipt of money by him from them, and as to that money being compensation for services being rendered before the Departments. Such being the situation, the finding of the facts was for the jury.

 In their reply brief, appellants say that a conspiracy must be proved independently of the acts and declarations of alleged conspirators in the absence of other conspirators. There is no such rule of law. The participation of an alleged conspirator can be proved by his own acts done in the absence of the others. The rules are

---

[39] Curley v. United States, 1947, 81 U.S.App.D.C. 389, 160 F.2d 229.

that one defendant's connection with a conspiracy cannot be established by the acts or declarations of *other* defendants in his absence, and that a defendant cannot be bound by the acts or declarations of *other* defendants until (a) the conspiracy has been established and (b) the defendant's participation in the conspiracy has been established.[40] Each conspirator's acts and declarations may be evidence of his own connection with the conspiracy, and the conspiracy may be proved by the sum total of the independent acts and declarations of all alleged participants. We are not here concerned with declarations. The evidence of this conspiracy, if there be any, is in the acts of the defendants. No attempt is made by the Government to connect any alleged conspirator with the conspiracy by the acts of others. Each conspirator is connected with the conspiracy by his own acts. There is also ample evidence of joint activity by the Garssons and May. We find no merit in this contention of appellants.

■ VII. Appellants say that the trial court erred in refusing to admit certain evidence proffered by them. Principally that evidence concerned the nature of the transactions in which May interceded before Government departments at the request or behest of the Garssons. The court declined to admit evidence as to alleged discrimination by the War Department against Erie and Batavia, the excellent production records of those companies, the functions of the Military Affairs Committee, justification of the complaints made to May by the Garssons, delays in production, requests made of the War Department by other Congressmen, whether May was right or wrong in interceding, and that May's intercession with the War Department on behalf of the Garssons produced no satisfactory results.

The question is basic in the case. The trial court held to the view that the nature of the transactions pending before the Department was immaterial to the issues in the case, upon the theory that the receipt of compensation by a Congressman for services rendered is an offense under the statute, even though the acts done as services were legal and proper in themselves. We have indicated our agreement with that view. Cases cited by appellants dealing with fraud, in which intent is an element, are not pertinent to this point.

Appellants say that in excluding this evidence the court refused to let them buttress their personal testimony with corroborative evidence. Evidence that the purpose of the payments made to May was not to recompense his intercession in Government matters was material, and the court granted full leeway in that respect. It admitted all the evidence proffered to prove that the payments were for other purposes; such evidence, for example, as accounting for the disbursement by May of the funds received by him, and full descriptions of May's business ventures with the Garssons.

The excluded evidence purported to relate to another phase of the case, the impulse which moved May to call upon the Government departments. May and Henry Garsson were permitted to testify that he interceded because it was his duty to do so when his attention had been called to improprieties, incompetence or injustice there. They alone purported to know what was in May's mind when he made the calls. The excluded evidence related to the factual truth of the conditions represented to May and which he says caused him to make the calls. Appellants contend that proof that May's assigned reasons were well-founded in fact would have tended to establish that they were in truth his reasons. The answer is to be found in the facts in the record rather than in the argument upon legal propositions. Brief discussion will sufficiently cover the subject. May testified that Henry Garsson complained that he could not get an interview with the Ordnance Department and was not permitted to bid on certain articles; that Gars-

---

40 See the cases collected and discussed in United States v. United States Gypsum Co., D.C.D.C.1946, 67 F.Supp. 397, 451 et seq. Glasser v. United States, 1942,

315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680, cited by appellants, supports the rules as we state them.

son said that he had adequate facilities and a good production record; and that he was being discriminated against because of his race. May said that he thereupon called the Ordnance Department in Washington and asked that Garsson be given an interview by officials in Chicago. He testified that he made the call because of Garsson's complaint to him. Evidence was proffered to prove that Garsson's production record was in fact good, and that he was in fact being discriminated against; that evidence was excluded.

We agree with the trial court. that the truth or falsity of the facts recited to May by some other person, upon the basis of which statements he interceded at the War Department, had no probative value upon the disputed issue. The issue was whether May acted because of the complaints he heard or because of the money he received. Whether the complaints were or were not well-founded in fact was immaterial to that issue. If, in truth, he acted solely because of a complaint which proved to be groundless, he should have been acquitted.

It seems to us that in their argument upon this point appellants misconceive the motive which played a part in these alleged offenses. The motive with which the Garssons paid and May received the money was material. That is, it was material that May did or did not receive the money as compensation for his calls upon the War Department. As to that motive, nobody could testify directly except May and the Garssons, because they alone could know. Also admissible upon the point were the facts and circumstances of the payments and the fact of the calls, all of which evidence was received. But whether May, being paid to make the calls, was striving to correct an actual impropriety or was activated by a groundless complaint was wholly immaterial. That is, payment for the service having been received, his subsequent "motive" to correct an actual impropriety had no bearing upon the offense. This was the view of the District Court, and we agree with it.

Examination of the record shows that other incidents of testimony and proffer were of the same character. Matters such as the fact that other Congressmen made inquiries at the War Department, and the functions of the Military Affairs Committee are even less relevant.

VIII. Appellants assert unfairness in their trial under eight general headings: misconduct of the prosecutor, cross-examinations by the judge, press and radio articles, the hostile attitude of the trial court, the court's interruption of the defense summation, the charge to the jury, the court's requirement of a list of defendants' witnesses, and unfair comment on the failure of appellants to testify.

Concerning the alleged misconduct of the prosecutor, the appellants make some thirty record references. We have read carefully each one and find no incident deserving discussion. Concerning comment by the trial court, appellants make nineteen record references. The complaints are little more than frivolous.

Appellants say that prejudicial articles appeared in the press and on the radio; that the jurors read newspaper articles, and that the court declined permission to examine the jurors under oath. Appellants filed an affidavit with their motion for a new trial and for examination of the jurors. The affiant was a real estate man who, at the request of one of appellants' counsel, interviewed "some members" of the jury. One juror was alleged to have said that "she read the newspapers and listened to the radio during the trial"; another "that he heard the case over the radio". The court held that the showing made by the affidavit was patently insufficient to justify examination of the jury on that matter. During the trial the court frequently impressed upon the jury the necessity for great care in reading newspapers and listening to the radio. We note also that the first juror interviewed did not even say that she had read or listened *about the case*. The second juror is said to have said that he "heard the case over the radio" but did not say that the report was adverse to the defendants, or that he was influenced by the report, or even that he listened *during* the trial. The circumstances of the

conversations between the affiant and the juror were not given, and affidavits of the jurors were not presented.

■ To impeach the integrity of a jury is a serious matter. It should be done only when circumstances of compelling seriousness require it.[41] No such circumstances were indicated here. We agree with the trial judge in his disposition of the matter.

We have read all portions of the record cited to indicate hostility or bias on the part of the trial judge. They not only fail to show bias but affirmatively indicate that the trial judge was both impartial and temperate, and this under stress of a long and bitterly contested trial.

■ Appellants say that the court interrupted defense summation and "diverted the jury's attention from the most important point of 'reasonable doubt' ". Counsel had been arguing reasonable doubt and then said " * * * if you can go home and face your children and those that are near and dear to you and say 'Today I rendered a verdict sending three of our citizens to the penitentiary' * * *." The court stopped him, saying "Now, Mr. Margiotti, the jury does not send anybody to the penitentiary. I will decide that issue if I am called upon to do so. * * *" We think that the court's interruption was not only correct but required.

■ Appellants say that the court required a list of defendants' witnesses but declined to require the same of the Government. Appellants had subpoenaed Secretary of State Marshall. The court ruled that it would not permit the calling of the Secretary or of people "similarly circumstanced", until it had been informed what testimony would be expected from them. The court said that a list need not be given the other side but that it saw no reason why the court should not have one. Later, counsel for the defense asked Government counsel whether they intended to call a Colonel Hunt. Government counsel declined to answer, and the court permitted the declination. In our view, these were eminently proper rulings.

■ Appellants say that the court commented unfairly upon their failure to testify. May and Henry Garsson testified. Murray Garsson did not. Appellants say that the comment of the court was a violation of Murray Garsson's constitutional rights and was so prejudicial as to the other two defendants that it constituted reversible error. We have examined with care all the incidents cited. The court did not comment on any defendant's failure to testify. The assertion that it did so is a conclusion drawn from several colloquies between court and counsel. The first occurred when the court, in the course of ruling upon an objection to a question, explained at some length the permissible extent of and the limitations upon methods of proof of motive. The court remarked that the defendants would be permitted to testify as to their motives. The second incident occurred during a colloquy concerning the admissibility of a proffered document, which contained a recitation that Murray Garsson had no interest in its subject matter. The court ruled the document either hearsay or a self-serving document, remarking that Murray Garsson made the written statement that he had no interest, "But he is not making it on the witness stand." The other cited incidents were merely references to the foregoing rulings.

None of the comments of the court were directed at the failure of the defendants to take the stand. All were in the course of extended colloquies concerning the method of proving certain facts. Only in the most indirect fashion were they references to failure to testify. No objection was made at the time to any of these comments.

41. United States v. Holt, C.C.W.D. Wash.1909, 168 F. 141, affirmed 1910, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021; McDonald v. Pless, 1915, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300; Hyde v. United States, 1912, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114, Ann.Cas.1914A, 614; Beard v. United States, 1936, 65 App.D. C. 231, 238, 82 F.2d 837, 844, certiorari denied, 1936, 298 U.S. 655, 56 S.Ct. 675, 80 L.Ed. 1382; United States v. McDonald, D.C.Minn.1923, 293 F. 433, 441; Walton v. Wild Goose Mining & Trading Co., 9 Cir., 1903, 123 F. 209, 221, certiorari denied, 1904, 194 U.S. 631, 24 S. Ct. 856, 48 L.Ed. 1158.

Counsel do not seem to have caught at the time the intimations which they now say were prejudicial. We doubt that the jury caught any such intimation.

The court instructed the jury: "You are instructed that the fact that the defendant, Murray Garsson, has not testified in his own behalf should not be considered or construed in any way against him, and you are not at liberty to indulge in any presumption or inference because he has not testified in his own behalf. He has a right to testify, or not, as he pleases."

There are, of course, many cases dealing with comment upon defendants' failure to testify, but we think that the doctrine of Milton v. United States[42] in this court disposes of the question under the circumstances of this case. We find no reversible error.

IX. Appellants say that the court's charge to the jury was biased, argumentative, misleading, inconsistent, contradictory and confusing. They particularize nine respects in which they say the court erred in the instructions which it gave. They were: (1) The court should have said that there was no direct evidence of conspiracy. (2) It should not have permitted the jury to determine whether the Garssons were aiders and abettors under Counts III and IV or conspirators under Count I. (3) It should have added to its instructions concerning falsus in uno the clause "except wherein it (the false testimony) has been corroborated". (4) It erred in its instructions concerning overt acts. (5) It erred in saying that the political ambitions of Senator Mead were immaterial. (6) It erred in saying that whether May was or was not successful in his efforts on behalf of the Garssons was immaterial. (7) It erred in first saying that May's profit, or lack of it, from the Cumberland Lumber Company and the recipient of the proceeds from the sale of Cumberland were immaterial, although, upon exception, the court later instructed that this evidence was material and should be considered in determining who owned Cumberland. (8) The court erred in its instructions concerning the merits of the matters upon which

May interceded at the War Department. (9) The charge was generally confusing, contradictory, misleading and biased.

We have discussed some of the foregoing matters while discussing the other phases of the case. We find no error upon consideration of the others. As to the contention that the charge was confusing and misleading, we have read it with care and do not find it so. The facts of the case were complicated in some of their details. Some of the issues were complicated. The trial was long and the evidence voluminous. The court was meticulous in its effort to have the jury understand the matters to be decided. That those matters were complicated was not its doing.

Appellants list five respects in which they say that the court erred in refusing to instruct as requested by the defendants. One such requested instruction concerned consideration of the overt acts in the determination of whether there was an illegal agreement, and one related to the good faith of Mr. May, which matters have been discussed hereinabove. It seems to us that the other requests were covered in substance in the charge.

It follows that the judgments below must be and are

Affirmed.

STEPHENS, Associate Justice:

I am unable to agree with the disposition of the case made by the majority for the reason that in my opinion the indictment is defective:

1. I think that Count I of the indictment is duplicitous. 18 U.S.C. § 88 (1946), defines conspiracy as follows:

> If two or more persons conspire *either* to commit any offense against the United States, *or* to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined . . . or imprisoned . . . or both. [Italics supplied]

Count I of the indictment charges the defendants Andrew J. May and Murray and Henry M. Garsson with having conspired

---

[42] 1940, 71 App.D.C. 394, 110 F.2d 556.

to commit an offense against the United States, to wit, a violation of 18 U.S.C. § 203 (1946) (which makes it unlawful for a member of Congress to receive compensation for services rendered in his official capacity), *and* to defraud the United States (there is no statute separate from 18 U.S.C. § 88 (1946) making it a crime to defraud the United States). Briefly, the defendants are charged with a conspiracy to commit an offense *and* to defraud. But Section 88 is worded in the disjunctive. It penalizes a conspiracy *either* to commit an offense *or* to defraud. I think therefore that Count I in effect charges the defendants with two conspiracies—a conspiracy to commit an offense, which is one crime under Section 88, and a conspiracy to defraud, which is another crime under Section 88. If this is correct the two crimes cannot be charged in the same count since Rule 8, Federal Rules of Criminal Procedure, 18 U.S.C.A., provides that two or more offenses may be charged in the same indictment in a separate count for each offense. United States v. Dembowski, E.D.Mich.1918, 252 F. 894, supports the view above expressed. The Espionage Act, 40 Stat. 219 (1917), 50 U.S.C. § 33 (1946), provides that:

> Whoever, when the United States is at war, shall willfully make or convey false reports or false statements with intent to interfere with the operation or success of the military . . . forces of the United States or to promote the success of its enemies and whoever, when the United States is at war, shall willfully cause or attempt to cause insubordination, disloyalty, mutiny, or refusal of duty, in the military . . . forces of the United States, or shall willfully obstruct the recruiting or enlistment service of the United States, to the injury of the service of the United States, shall be punished by a fine . . . or imprisonment . . . or both.

In the Dembowski case an indictment under this statute charged in a single count that the defendant did "willfully and knowingly make and convey false reports and false statements against the United States army . . . with intent to . . . interfere with the operations and success of the military . . . forces of the United States, and with the intent to

. . . promote the success of the enemies of the United States, and did . . . cause and attempt to cause insubordination, disloyalty, mutiny, and refusal of duty in the said military . . . forces of the United States by the members of such service . . . and did . . . willfully obstruct the recruiting and enlistment service of the United States to the injury of the . . . United States . . .." (252 F. at 896) The court held that the statute created three offenses and that only one such could be charged in a single count. The court recognized that it is settled that where a statute creates a single offense but specifies in the alternative a number of different acts any one of which will constitute the offense, these acts not being in themselves separate crimes but only different means of committing the offense against which the statute is directed, an indictment may charge the commission of such offense by all of the means mentioned in the statute —using the conjunctive *and* wherever the statute uses the disjunctive *or*—and will not be duplicitous and that proof of the doing of any one of the acts will warrant conviction. But the court, examining the language of the Espionage Act, held that it was clear that Congress had in mind in its disjunctive phrasing several distinct evils, and that in order to guard against all of such evils and the different dangers consequent upon each, it prohibited three different kinds of acts; and the court thought it plain that under the language of the statute each of the acts thus prohibited was separate and distinct in its nature and objectives, and that the commission of such acts constituted distinct and separate offenses which could not be joined in one count of the indictment. Specifically the court said:

> A careful examination of the present indictment shows that it does not charge one transaction as a single offense committed by different acts. It will be noted that it charges the defendant, in the language of the statute, with having done all of the things forbidden by this section of the Espionage Act. . . . the statute creates, and this indictment charges, three distinct offenses and . . . such indictment is therefore bad for duplicity . . . . [252 F. at 897, 898]

In the instant case, it is clear that Congress in Section 88 of Title 18 had in mind distinct evils with different dangers consequent upon each. A conspiracy to commit an offense against the United States may involve one of many different kinds of offenses denounced by the Federal statutes, but these offenses may or may not constitute a defrauding of the United States. For example, murder on a military reservation, transporting of a woman across a state line for immoral purposes, and agreements to fix prices on goods transported in interstate commerce are all offenses against the United States, but no one of them involves defrauding the United States. That the principle recognized in the Dembowski case is applicable to Section 88 was also recognized, by implication, in Sugar v. United States, 6 Cir., 1918, 252 F. 79, which is discussed below in topic 3.

In support of Count I of the indictment the Government relies upon United States v. Manton, 2 Cir., 1938, 107 F.2d 834. The indictment in the Manton case, drawn under Section 88 of Title 18, charged in a single count that the several defendants "conspired to commit offenses against the United States, to wit: corruptly to endeavor to influence, obstruct and impede the due administration of justice in suits pending before certain courts of the United States; and to defraud the United States of and concerning its right to have the lawful functions of the judicial power of the United States exercised and administered free from unlawful impairment and obstruction . . .." (107 F.2d at 837) The court held that a demurrer attacking the indictment as duplicitous had been properly overruled by the trial court. The court cited and principally relied upon Frohwerk v. United States, 1919, 249 U.S. 204, 39 S.Ct. 249, 63 L.Ed. 561. Therein the first of thirteen counts of an indictment charged a conspiracy by the plaintiff-in-error and one Carl Gleeser, they then being engaged—it was alleged—in the preparation and publication of a newspaper, to violate the Espionage Act. The count charged as overt acts the preparation and circulation of twelve articles in the newspaper at different dates. The other counts alleged attempts to cause disloyalty, mutiny and refusal of duty in the military forces by the same publications, each count being confined to the publication of a single date; but these counts did not involve conspiracy. It was urged as to the first count, i. e., the conspiracy count, that it was duplicitous. But the Court held that "The conspiracy is the crime, and that is one, however diverse its objects" (249 U.S. at 210, 39 S.Ct. 252), and said that a single count in an indictment for conspiring to commit two offenses is not bad for duplicity.

In the Manton case the court, in addition to relying upon the Frohwerk case, cited Magon v. United States, 9 Cir., 1919, 260 F. 811, and Anderson v. United States, 9 Cir., 1920, 269 F. 65. The court said that the conspiracy itself is the offense, regardless of the number of acts performed in furtherance thereof, and that that offense becomes complete when the agreement is made. It held that the indictment was not bad for duplicity in alleging that the conspiracy contemplated violation of a criminal statute and also the defrauding of the United States. Apparently, therefore, in view of the cases relied upon and the reasoning stated, the court in the Manton case did not really consider the question whether or not Section 88 of Title 18 contemplates different conspiracies, one to commit an offense against the United States, the other to defraud the United States; and if it did consider the point, I think it misinterpreted the statute which, like the statute in the Dembowski case, is disjunctive in meaning and obviously aims at different evils with different consequences. The court in the Manton case also, in my view, misinterpreted the indictment in that case. It did not regard it as duplicitous because it thought it charged only a single conspiracy. As a matter of fact, it charged two, if the terms of the statute, Section 88, are rightly read.

It may be noted, although it is perhaps not of controlling importance in view of what has been said above, that in the Manton case the offense charged as an object of the conspiracy was a violation of Section 241 of Title 18 of the United States Code, 35 Stat. 1113 (1909), penalizing one who "corruptly or by threats or force . . . shall influence, obstruct, or im-

pede, or endeavor to influence, obstruct, or impede, the due administration of justice" in any court of the United States, whereas the defrauding charged as an object of the conspiracy was defrauding the United States "of and concerning its right to have the lawful functions of the judicial power of the United States exercised and administered free from unlawful impairment and obstruction . . .." (107 F.2d at 837) It will be seen from examining the indictment in the Manton case that the acts charged to have been committed under the conspiracy came within both of the denunciations, i. e., the acts constituted both an offense against the United States and a defrauding; and they constituted one and the same evil against which Congress sought to guard, and the dangers consequent were the same. The acts charged as the object of the conspiracy were these: One Fallon was to seek out litigants and parties, whether then known or unknown, who were interested in suits then or thereafter pending, and was in effect to represent to each of them that Manton, a judge, would accept sums of money in return for corrupt judicial action by him favorable to the interests of those who paid. As characterized in the opinion, "In short, the conspiracy to obstruct the administration of justice and to defraud the United States was to be consummated by sale of judicial action to all willing to pay the price." (107 F.2d at 838) The court went on to say "That this was a single continuing offense and not a number of distinct offenses is settled by numerous decisions." (Ibid.) It may well be that it was this that—as I see it—misled the court in the Manton case to think of the indictment as involving one conspiracy rather than two. In the indictment in the instant case the act charged as constituting the offense against the United States and the acts charged as constituting the defrauding of the United States are not the same. Receipt of compensation for services rendered or to be rendered is the offense charged; it is the performance of the services that results in the defrauding charged. Hence, the ruling in the Manton case is confined to facts unlike those involved in the instant case. The Manton case holds only that where

persons are to be charged with conspiring to commit an offense against the United States, which is in and of itself a defrauding of the United States, they may under Section 88 be charged in one count with conspiring to commit an offense against the United States and to defraud the United States. But that is not the instant case.

2. I think Count I of the indictment in the instant case is defective for a further reason. The offense against the United States, violation of 18 U.S.C. § 203 (1946), which the defendants are in Count I charged with having conspired to commit is one requiring, from its very nature, concert of action and agreement between the parties involved. The offense is receipt of compensation by a member of Congress for services rendered or to be rendered. But receipt of compensation cannot be accomplished without compensation also being given and requires therefore concert of action and agreement between the receiver and the giver. This being so, it is not legally possible to make the commission of such an offense the subject of a conspiracy charge. It is like charging a conspiracy to conspire. This is illustrated in United States v. Dietrich, C.C.D.Neb.1904, 126 F. 664. In that case two defendants were indicted under Rev.Stat. § 5440 (the counterpart of 18 U.S.C. § 88 (1946)) for conspiring to violate Rev.Stat. § 1781 (the counterpart of 18 U.S.C. § 202 (1946)) which made it an offense (1) for a member of Congress to take or to agree to take valuable consideration from any person for procuring any contract, office, or place from the Government or any department thereof, or from any officer of the United States, for any person whatever, or for giving any such contract, office, or place to any person whomsoever; (2) for any person directly or indirectly to offer or agree to give, or give, or bestow any like consideration for the procuring, or aiding to procure, any such contract, office, or place; (3) for any member of Congress to take or agree to take any valuable consideration after his election for his attention to, services, action, vote, or decision in matters brought before him in his official capacity (this third portion of the statute is not involved in the Dietrich case). It was charged that

the defendants conspired to commit an offense against the United States, by Dietrich, a Congressman, agreeing to receive a bribe from the other defendant, one Fisher, for procuring the appointment of the latter as a postmaster. The court sustained a demurrer to the indictment. In so doing it said:

> . . . The making of such an agreement is not a conspiracy within the terms of section 5440, but is a several and substantive offense under section 1781 upon the part of each of the parties, and this without the doing of any overt act in pursuance thereof. The latter section . . . specifically covers the act of a member of Congress who receives, or agrees to receive, any money, property, or other valuable consideration for procuring or aiding to procure for another an office from the federal government; and it also specifically covers the act of any person who gives, or agrees to give, a like consideration for such service or aid. As the transaction is stated in the indictment, it was Dietrich who agreed to receive the bribe, not Dietrich and Fisher, and it was Fisher who agreed to give the bribe, not Fisher and Dietrich. The charge is not that two or more persons agreed among themselves to corruptly obtain the aid of another, a member of Congress, in securing the appointment of some aspirant to a federal office, nor is it that two or more members of Congress agreed among themselves to obtain from another person a reward or compensation for their services or aid in securing such an appointment. . . . *The agreement or transaction stated in this indictment was immediately and only between two persons, one charged with the intended taking, and the other with the intended giving of the same bribe. Concert and plurality of agents in such an agreement or transaction are, in a sense, indispensable elements of the substantive offenses, defined in section 1781, of agreeing to receive a bribe and of agreeing to give one. A person cannot agree with himself, receive from himself, or give to himself.* . . . [Italics supplied] [126 F. at 666–667]

It is true that the statute involved in the Dietrich case, Rev.Stat. § 1781, made both the giving and receiving of a bribe criminal offenses, whereas the statute in the instant case makes only one party to the transaction (the recipient Congressman) guilty of an offense. But this distinction cannot dictate a different result in the instant case since the foundation of the ruling of the court in the Dietrich case is the nature of the transaction assailed rather than the fact that both parties are made criminally liable.

The Government in the instant case seeks to avoid the effect of the Dietrich case by reliance upon the Manton case discussed above and also upon Ex Parte O'Leary, 7 Cir., 1931, 53 F.2d 956. But in the Manton case the court expressly refused to pass upon the question now under discussion in the instant case. It was urged in the Manton case "that the indictment charges, and that the government sought to prove, a conspiracy to accept and secure bribes, and that this is not an indictable conspiracy." (107 F.2d at 839) But the court said that it did "not stop to inquire whether . . . the conclusion would follow from the premises, since it is clear that the premises are not true." (Ibid.) Moreover, in the Manton case the nature of the offense which was the object of the conspiracy as charged in the indictment, to wit, obstructing or impeding the due administration of justice, did not in and of itself necessarily involve action in concert, as did the offenses which in the Dietrich case (and the offense in the instant case) were the objects of the conspiracy as charged. In Ex Parte O'Leary the defendants were charged with conspiring, in violation of Section 88 of Title 18, to commit an offense denounced by Section 207 of Title 18, 35 Stat. 1109 (1909), which makes it criminal for an officer of the United States to accept a bribe but does not penalize the giving of the bribe. The case is therefore on its facts substantially parallel to the Dietrich case. The details of the conspiracy charged were that one Sullivan, a lawyer, arranged to represent one Morrell who had a claim pending before O'Leary, an officer of the Veterans' Bureau, for physical disability alleged to have been incurred in the military service. O'Leary was to receive a portion of the money to be collected for Morrell; and it was alleged that there was an intent thereby to influence O'Leary in his official capacity, and an intent on his part to be influenced in respect of approving or disapproving the claim. After conviction and dismissal of an appeal for lack

of a bill of exceptions, the defendants petitioned the United States District Court for Wisconsin for a writ of habeas corpus, and, after a denial of that writ, attempted to appeal to the Court of Appeals for the Seventh Circuit. That court for reasons not pertinent here held that there was no appealable order before it, but it nevertheless discussed the merits of the petition for the writ. It pointed out that the asserted basis for the writ was the insufficiency of the indictment upon which the defendants were convicted and sentenced and that the attack upon the indictment was predicated upon the ruling of the court in the Dietrich case and was directed to the proposition that a conspiracy to commit the crime of bribery by two persons who are the alleged conspirators fails if it is shown that the bribery has been completed. The Court of Appeals in the O'Leary case declined to follow the Dietrich decision. It did so in part because it thought the Dietrich case and the O'Leary case distinguishable on their facts, and in part because of the ruling in United States v. Holte, 1915, 236 U. S. 140, 35 S.Ct. 271, 59 L.Ed. 504, L.R.A. 1915D, 281. But, as explained below, the Holte case does not restrict the ruling in the Dietrich case.

In the Holte case the indictment charged a conspiracy between a woman, Holte, who was the named defendant, and one Laudenschleger, to cause the defendant to be transported across a state line for the purpose of prostitution contrary to the Mann Act, 36 Stat. 825 (1910), 18 U.S.C. §§ 397–404 (1946). The trial court sustained a demurrer to the indictment upon the ground that although the offense could not be committed without the defendant, she was not a party to it but only the victim. The Supreme Court reversed in an opinion by Mr. Justice Holmes, Justices Lamar and Day dissenting. Holmes' view was that the defendant woman *could* be guilty of conspiracy. In reaching this conclusion he stated, upon the authority of such cases as United States v. Martin, Fed.Cas., No. 15,-728, 4 Cliff. 156, 164, United States v. Bayer, Fed.Cas., No. 14,547, 4 Dill. 407, 410, and United States v. Stevens, D.C.Minn. 1890, 44 F. 132, 140, that "a conspiracy with an officer or employé of the government or any other for an offense that only he could commit has been held for many years to fall within the conspiracy section, now § 37 of the penal code [18 U.S.C. § 88]." (236 U.S. at 145, 35 S.Ct. 272, 59 L. Ed. 506, L.R.A.1915D, 281) The ruling in these cases is illustrated in United States v. Stevens where it was held that a conspiracy could be charged against several persons, including a census enumerator, to insert false and fictitious names in the census schedules. This it will be seen is not in conflict with the theory of the Dietrich decision because the act of inserting a fictitious name in the census schedules could be done by the enumerator himself alone; it did not require concert of action for him to accomplish that act. Holmes, however, went on to reason that under the Mann Act the woman could conceivably be the motivating force behind her own transportation for immoral purposes and thus be guilty of the substantive offense itself, and he reasoned still further that since a woman could be transported in violation of the Mann Act while drugged or taken by force, the offense did not require that concert of action which precludes a charge of conspiracy. It is to be noted that these views expressed by Holmes are applicable only to extreme and hypothetical cases and not necessarily to the offense charged in the indictment which was under review in the Holte case. In Gebardi v. United States, 1932, 287 U.S. 112, 53 S.Ct. 35, 77 L.Ed. 206, 84 A.L.R. 370, a man and woman were charged with a conspiracy to violate the Mann Act through transportation of the woman across a state line for immoral purposes. There was evidence supporting a finding that the defendants had engaged in illicit sexual relations in the course of journeys alleged, that the man had purchased the railroad tickets, and that the woman had consented each time to making the journey and that she went for the immoral purposes charged. The trial court had overruled motions for a finding for the defendants and motions for an arrest of judgment and had given judgment of conviction, and the Court of Appeals for the Seventh Circuit affirmed, on the authority of the Holte case, in an opinion by Judge Evans—it being he also who had

written the opinion in the O'Leary case. But the Supreme Court reversed the conviction. It reasoned that the exceptional circumstances envisaged in the opinion of Holmes in the Holte case were not present before it. It said the mere consent of the female defendant was not such aid and assistance as would cause her to fall within the ban of the Mann Act, that since that statute is drawn to include those cases in which the woman consents to being transported, without specifically imposing any penalty upon her, the Court perceived "evidence of an affirmative legislative policy to leave her acquiescence unpunished. We think it a necessary implication of that policy that when the Mann Act and the conspiracy statute came to be construed together, as they necessarily would be, the same participation which the former contemplates as an inseparable incident of all cases in which the woman is a voluntary agent at all, but does not punish, was not automatically to be made punishable under the latter. . . ." (287 U. S. at 123, 53 S. Ct. 38) In brief the theory of the Court appears to be that the woman, to be guilty of conspiracy to violate the Mann Act, must be more than a mere consenting participant, must be an active instigator.

In the Gebardi case the Court recognized that such cases as the Dietrich case are distinguishable from the extreme situations envisaged in the Holte case. It made this observation in connection with its comment that in the Mann Act Congress set out to deal with cases which frequently involve consent and agreement on the part of the woman to the forbidden transportation but that they nevertheless are not the only cases covered by the Act (meaning apparently that forced transportation or drugged transportation would also be covered, i. e., that consent by the woman was not a necessary ingredient), and the Court then said:

> . . . If this [a case involving acquiescence] were the only case covered by the Act, it would be within those decisions which hold, consistently with the theory upon which conspiracies are punished, that where it is impossible under any circumstances to commit the substantive offense without coöperative action, the preliminary agreement between

the same parties to commit the offense is not an indictable conspiracy either at common law, Shannon and Nugent v. Commonwealth, 14 Pa.St. 226; Miles v. State, 58 Ala. 390; cf. State v. Law, 189 Iowa 910; 179 N.W. 145 [11 A.L.R. 194]; see State ex rel. Durner v. Huegin, 110 Wis. 189, 243; 85 N.W. 1046 [62 L.R.A. 700], or under the federal statute. See United States v. Katz, 271 U.S. 354, 355 [46 S.Ct. 513, 70 L.Ed. 986]; Norris v. United States [3 Cir.], 34 F.(2d) 839, 841, reversed on other grounds, 281 U.S. 619 [50 S.Ct. 424, 74 L.Ed. 1076]; United States v. Dietrich [C.C.] 126 Fed. 634, 667. . . . [287 U.S. at 121-122, 53 S.Ct. 37]

The Court went on to say that it assumed that the decisions last mentioned did not in all strictness apply and that it did not rest its decision upon the theory of those cases nor upon the related one that the attempt is to prosecute as conspiracy acts identical with the substantive offense, citing again the Dietrich case.

It seems clear from the foregoing that the Holte decision as explained in the Gebardi case in no way restricts or even affects the ruling in the Dietrich case—Judge Evans' apparent view to the contrary notwithstanding. The Dietrich case therefore supports the position which I above outline in this topic 2 in respect of the insufficiency of the first count of the indictment in the instant case in charging a conspiracy to commit an offense against the United States, to wit, violation of 18 U.S.C. § 203 (1946), i. e., in charging in effect a conspiracy to conspire.

3. That the charge of conspiracy to violate 18 U.S.C. § 203 (1946) does not, as I think I have demonstrated in topic 2, constitute an indictable offense, cannot cure the duplicity of Count 1 discussed in topic 1. In Sugar v. United States, cited above, several persons were charged in one count with conspiring to commit an offense against the United States (to violate the Selective Draft Act, 40 Stat. 80 (1917)), and "to defraud the United States." (252 F. at 80) There was a conviction and on appeal by one of the defendants it was contended that the count was bad as charging two distinct offenses. The Court of Appeals for the Sixth Circuit affirmed

the conviction, disposing of the contention upon the ground that the words "to defraud the United States" were surplusage. But that case is distinguishable from the instant case. In the Sugar case the trial court, in denying a motion before trial to quash, had interpreted the indictment in the same manner as did the appellate court, stating that "the indictment makes it quite clear that the defendants are charged with conspiracy to commit an offense against the United States, and not to defraud the United States. I am satisfied that the words in the indictment 'to defraud the United States,' are mere surplusage and should be disregarded. . . ." United States v. Sugar, E.D.Mich.1917, 243 F. 423, 426. In the instant case, however, the trial court—not regarding the indictment as duplicitous—did not remove from the jury's consideration the charge of conspiring to violate Section 203. On the contrary, as the transcript shows, it instructed the jury that "If you believe that the defendants conspired to defraud the United States, or to violate Section 203 of Title 18, United States Code . . . and committed one or more of the overt acts to effect the object of the conspiracy . . . you should convict the defendants . . . ." The additional words in the indictment in the Sugar case could have had no prejudicial effect upon the defendants therein since they were treated as surplusage from the outset of the trial. But in the instant case, in view of the disjunctive phrasing of the instruction, the jury might well have found the defendants guilty under only the charge (of conspiring to conspire, i. e., of conspiring to violate Section 203) contained in the "surplusage," and on that basis have convicted them of something which, as pointed out in topic 2, is no offense. That being so, the submission to the jury of that portion of Count I of the indictment should, in my view, be held to have been prejudicial to the defendants. I think that it cannot be treated as surplusage and the defect of the duplicity of Count I be thus cured.[1]

4. So far as it concerns the defendants Murray and Henry M. Garsson, each of Counts III and IV of the indictment is, I think, defective, in and of itself, i. e., without regard to its relation to the rest of the indictment. These two counts are similarly drawn. Each of them charges May with violation of 18 U.S.C. § 203 (1946) (the receiving of compensation by a Congressman for services rendered or to be rendered) and charges the Garssons with aiding and abetting May in his violation of Section 203. The charges against the Garssons are rested upon 18 U.S.C. § 550 (1946). That section provides that "Whoever directly commits any act constituting an offense defined in any law of the United States, or aids, abets, counsels, commands, induces, or procures its commission, is a principal." The two counts differ only in respect of the amounts of compensation charged to have been received by May and the dates of receipt alleged.

The Government attempts to support Counts III and IV as against the Garssons under the general aiding and abetting statute just quoted. I think this is not possible. Section 203, which defines the crime the commission of which the Garssons are charged with aiding and abetting, does not make the giving of compensation to a Congressman a crime but only the receiving by him of compensation. I think the law is settled that where a statute denounces an act as criminal but does not penalize the conduct of a necessary participant in that criminal act, the participant may not be held guilty as an aider or abettor. In the Gebardi case discussed above Mr. Justice Stone stated:

> . . . we cannot infer that the mere acquiescence of the woman transported was intended to be condemned by the general language punishing those who aid and assist the transporter, any more than it has been inferred that the purchaser of liquor was to be regarded as an abettor of the illegal sale. State v. Teahan, 50 Conn. 92; Lott v. United States [9 Cir.], 205 Fed. 28 [46 L.R.A.,N.S., 409]; cf. United States v. Farrar, 281 U.S. 624,

---

[1] It is to be noted that the Sugar case, like the instant case, involved Section 88 of Title 18, 35 Stat. 1096, and that the Court of Appeals in deciding the Sugar case implied that if the single count there involved *had* charged a conspiracy to commit an offense against the United States *and* to defraud the United States, it would have been duplicitous.

634 [50 S.Ct. 425, 74 L.Ed. 1078, 68 A. L.R. 892]. . . . [287 U.S. at 119, 53 S.Ct. 36, 77 L.Ed. 209, 84 A.L.R. 370]

In the Lott case a statute prohibited the sale of liquor to an Indian but did not make the purchase criminal. It was held that a purchaser Indian could not validly be charged with aiding and abetting the selling of liquor to him. The reasoning was that although the Indian was a necessary participant in the act made illegal, he was absolved by the statute of any liability for his participation therein, i. e., absolved by the omission of the statute to make his participation criminal. It follows that in the case at bar, since Section 203 does not make it a crime to give compensation to a member of Congress, the Garssons, the necessary participants in May's act of receiving compensation, may not by indirection be validly charged as aiders and abettors, Congress having evidenced its intention that such persons go unpunished.

In support of the indictment of the Garssons under Counts III and IV, the argument is made that Congress must, when it enacted Section 203, be taken to have had the general aiding and abetting statute in mind, that statute being then in existence. Hence, it is urged, Congress must have intended that the giver of compensation to a Congressman should be punished criminally as an aider and abettor. But this argument fails since it seems clear that Congress did not have the general aiding and abetting statute in mind when it enacted Section 203 since at the same time— March 4, 1909—it enacted also Section 202 which makes criminal the giving of a bribe to a Congressman as well as the receipt by him of a bribe. Had Congress at that time had the general aiding and abetting statute in mind, it would have been unnecessary to make criminal the giving of a bribe a crime as Congress did in Section 202. It may be urged as a counter-argument that, while Sections 202 and 203 were enacted on March 4, 1909, their enactment was in the form of a revision and the original bribery statute was passed in 1862 and the original statute making it criminal for a Congressman to receive compensation was not enacted until 1864; therefore the proposition that Congress could not have had the general aiding and abetting statute in mind when it passed Section 203, else it would not have made it a crime to give a bribe under Section 202, is invalid, i. e., since these two sections were not originally coincidentally enacted. But this "historical" counter-argument runs against the insuperable obstacle that at the time the original statute making it criminal for a Congressman to receive compensation was passed (1864) there was no general aiding and abetting statute in existence.[2] It is clear therefore that Congress did not at that time intend that the giver of compensation to a Congressman should be criminally liable.

5. It may be said that even though Counts III and IV of the indictment are defective as against the Garssons for the reasons set forth in topic 4, these counts are valid as against May, charged therein as a principal in the crime of receiving compensation in violation of 18 U.S.C. § 203 (1946), and that his conviction may therefore be sustained under those counts. But this omits to consider an objection to the indictment as a whole, as concerns both May and the Garssons, which is seen when Count I is compared with Counts III and IV in view of the nature of the acts which are charged as criminal. Those acts include the payment by another of compensation to a Congressman in consideration of services rendered or to be rendered, the receipt of such compensation by him, and the agreement between the parties in respect of the foregoing. Those very acts (including the agreement), no more and no less, are the acts which constitute the conspiracies charged in Count I, and which constitute the receiving of compensation and the aiding and abetting charged in Counts III and IV. The fact is therefore

---

[2] The only aiding and abetting statute in existence in 1864 was one in respect of piracy, Act of April 30, 1790, ch. 9, § 10, 1 Stat. 114. This provided: ". . . every person who shall . . . knowingly and wittingly aid and assist, procure, command, counsel or advise any person or persons, to do or commit any murder or robbery, or other piracy . . . upon the seas, shall be, and they are hereby declared, deemed and adjudged to be accessory to such piracies before the fact, and every such person being thereof convicted shall suffer death."

that, by giving different criminal labels in Count I on the one hand and in Counts III and IV on the other to this very same group of acts, it is sought to make them punishable twice, once under the conspiracy charge of Count I and again under the receiving compensation and the aiding and abetting charges in Counts III and IV. This cannot be treated as harmless error upon the theory that the maximum penalties provided for in the statutes so far as fine and imprisonment are concerned are the same for conspiracy (Section 88) as they are for the receiving of compensation (Section 203) and the aiding and abetting thereof[3] because Section 203 denouncing a Congressman's receiving compensation has an additional penalty. It provides that one violating the section shall, after being subjected to fine and imprisonment, "moreover thereafter be incapable of holding any office of honor, trust, or profit under the Government of the United States." I think therefore that the Government should have been required by the trial court to elect to rely upon either Count I or Counts III and IV. No such election is shown by the record to have been required; the case was submitted to the jury upon all three counts of the indictment. Therefore, in view of the defect in the indictment as a whole, the conviction in my opinion cannot properly stand as to either May or the Garssons.

The defects which I think exist in the indictment are obviously of substantial character and cannot therefore be disregarded under 18 U.S.C. § 556 (1940) or Rule 52(a), Federal Rules of Criminal Procedure. A precedent supporting an indictment with such substantial defects should I think not be set.

---

[3] Section 88 provides that each of the parties to a conspiracy shall be fined not more than $10,000, or imprisoned not more than two years, or both; Section 203 provides for a fine of not more than $10,000 and imprisonment for not more than two years.